John PEREZ, Plaintiff,

v.

PROCTOR AND GAMBLE MANUFAC-TURING COMPANY, Defendant.

No. Civ.S–99–2000FCDDAD.

United States District Court,
E.D. California.

Aug. 24, 2001.

Richard M. Jacobson, Maria S. Rosenfeld, Jacobson Markham, L.L.P, Sacramento, CA, for the plaintiff.

Steinhart & Falconer LLP, Dov M. Grunschlag, Tamara Mason–Williams, San Francisco, CA, for the defendants.

### AMENDED MEMORANDUM AND ORDER

DAMRELL, District Judge.

Plaintiff John Perez brings this diversity action alleging that his former employer Proctor and Gamble Manufacturing Company ("P & G") discriminated against him on account of his mental disability in violation of the California Fair Employment and Housing Act ("FEHA"), Cal.Gov.Code § 12940(k), and constructively discharged him in violation of public policy. This matter is before the court on P & G's motion for summary judgment.[1] For the reasons set forth below, P & G's motion is denied.

### BACKGROUND

#### 1. Plaintiff's Employment

Plaintiff John Perez worked for P & G at its Sacramento plant from May 1976 until his alleged constructive termination on August 19, 1999. During the course of his employment, plaintiff worked in a number of jobs at P & G, including soap worker, cook, security guard, warehouse worker, and forklift clamper. At all relevant times herein, plaintiff worked as a high-pressure equipment operator on Team D in the alcohol department of the plant.

P & G manufactures industrial chemicals used in detergents and other products at its Sacramento plant. The plant operates 24 hours a day, 7 days a week. Plaintiff's job as a high pressure operator required that he work rotating 12–hour shifts and that he work with and around

---

1. This motion was originally noticed for hearing on November 17, 2000. On December 4, 2000, the court denied the motion without prejudice and stayed the proceedings pending a decision by the California Supreme Court in *Swenson v. County of Los Angeles*, 75 Cal. App.4th 889, 89 Cal.Rptr.2d 572 (1999) in which the Court was expected to address a split in the California appellate courts concerning the standard for establishing a "mental disability" under FEHA. The California Supreme Court, however, dismissed the case on January 24, 2001 without issuing an opinion. *Swenson v. County of Los Angeles*, 104 Cal.Rptr.2d 53, 16 P.3d 717 (Cal.2001). Thereafter, P & G filed the instant motion for summary judgment.

toxic chemicals. Plaintiff was a member of the plant's union, the Independent Oil and Chemical Workers of Sacramento, California.

## 2. P & G's Disciplinary Policies

P & G uses a five-step, progressive disciplinary system: Step 1, file entry; Step 2, disciplinary file entry; Step 3, short layoff (12 hours); Step 4, long layoff (36 hours); and Step 5, termination. According to P & G, the Sacramento Plant Technician Selection System ("selection guidelines") provides that employees at Step 2 or above in the disciplinary process are not eligible to transfer or bid for job openings. Plaintiff does not dispute P & G's interpretation.[2]

## 3. Plaintiff's Disciplinary Standing

Plaintiff worked at P & G for over twenty years without incident. In the Spring and Summer of 1997, however, plaintiff was disciplined on three separate occasions and received a mandatory referral to the Employee Assistance Program ("EAP"). On April 8, 1997, plaintiff was found sleeping at work and was given a disciplinary file entry (Step 2). The next day, April 9, plaintiff left his operation unattended to search for a rubber band for his hair and was given a short-term layoff (Step 3) that P & G later reduced to a disciplinary file entry (Step 2). Three months later, on July 2, 1997, plaintiff received a mandatory referral to the EAP. On July 10, 1997, plaintiff was given a short-term layoff (Step 3) after exhibiting disrespectful behavior towards his co-workers at a team meeting.

## 4. Plaintiff's Condition

In accordance with the EAP referral, plaintiff saw a psychiatrist, Dr. Grace Lusk. On July 14, 1997, Dr. Lusk diagnosed plaintiff with a panic disorder and probable bipolar disorder. Dr. Lusk took plaintiff off work and prescribed Depakote.[3] P & G placed plaintiff on disability leave, effective July 10, 1997. Dr. Lusk later modified her diagnosis to bipolar disorder and post-traumatic stress disorder.

On December 5, 1997, Dr. Lusk submitted a physician's certificate to P & G that included a transitional return to work plan. The plan indicated that plaintiff could return to work effective March 1, 1998 with the following job modifications: not to handle toxic substances and not to work more than eight hours a day. These accommodations were to remain in effect until December 1, 1999.

P & G referred plaintiff to Dr. Michael Meek for an independent medical evaluation. Plaintiff was examined by Dr. Meek on December 10, 1997. Dr. Meek opined that plaintiff "does appear to be suffering from a Major Affective Disorder complicated by Post–Traumatic Stress Disorder." Meek report, dated Dec. 15, 1997, attached as Ex. C/9 to Grunschlag Decl. Dr. Meek indicated that plaintiff was suffering from extreme mood swings, ranging from manic behavior to periods of withdrawal and isolation, and a significant sleep disturbance. *Id.* Dr. Meek found it likely that plaintiff's disrupted sleep cycles were due, at least in part, to his post-traumatic stress disorder, but that the situation could be accommodated by an eight-hour daytime schedule. *Id.*

---

**2.** The selection guidelines provide in pertinent part: "If the recommended person has received a negative record card entry within the last 12 months, the Operations Manager should *not* accept the recommendation of the selection committee, and will ask the committee for another candidate." Ex. 7 to McKee Decl.

**3.** Depakote is a mood stabilizer. *See* Meek report, dated Dec. 15, 1997, attached as Ex. C/9 to Grunschlag Decl.

On January 1, 1998, Dr. Lusk issued another physician's certificate that included a transitional return to work plan with the same modifications; however, the length of accommodation was reduced to December 1, 1998 (as opposed to December 1, 1999 as previously specified). Dr. Lusk issued additional physician's certificates with similar return to work plans in March, April, and May 1998. Plaintiff, however, was not ready to return to work until at least May 1998. On July 2, 1998, Dr. Lusk issued a physician's certificate that included the same modifications, but was unclear as to the length of the accommodation.[4]

After receiving Dr. Lusk's July 1998 certificate, P & G referred plaintiff to Dr. Meek for re-evaluation. P & G informed Dr. Meek of Dr. Lusk's return to work plan, including the recommended job modifications. Meek report, dated July 23, 1998, attached as Ex. C/6 to Grunschlag Decl. P & G also informed Dr. Meek that it could accommodate plaintiff in an eight-hour a day position for only four weeks. *Id.* Dr. Meek noted that plaintiff appeared to be "considerably improved," but did present as mild to moderately hypomanic at the time of the exam. Dr. Meek further noted that plaintiff clearly wished to return to work and "feels that if given an opportunity for at least a month, he could work with his immediate Supervisor to the point that they become confident in his skills and his ability to handle the work environment." *Id.* While plaintiff recognized that 12–hour rotating shifts could adversely impact his condition, he felt that he could accommodate the requirement over the long-term by working with his supervisor and Dr. Lusk. *Id.* Dr. Meek opined that plaintiff could successfully re-turn to work in a setting where he worked eight-hour day shifts. Dr. Meek found it doubtful, however, that plaintiff could successfully return to rotating 12–hour shifts. Nevertheless, he could not "eliminate the possibility" that plaintiff could do so. *Id.* Dr. Meek did not address the toxic chemical modification.

### 5. P & G's Response to Plaintiff's Condition

On July 24, 1998, plaintiff's department manager Doug MacPherson told plaintiff not to report for work on July 27, 1998, as plaintiff's case was still being reviewed. Nevertheless, plaintiff showed up at the P & G plant on July 27, 1998 with his union representatives and was asked to leave by a security officer.

In late July 1998, P & G told plaintiff he could return to his job after a transition period of approximately four weeks during which he would work under the modifications suggested by the doctors, provided Dr. Lusk approved the plan and plaintiff authorized her to communicate with P & G representatives on a need-to-know basis. Indeed, by letter dated July 31, 1998, P & G requested Dr. Lusk state whether she was authorized (1) to discuss plaintiff's case with P & G's medical representatives, (2) to report on plaintiff's "Depakote level" every two months, and (3) to discuss work issues with plaintiff's department manager and P & G's Human Resources Manager. Cooper letter, dated Jul. 31, 1998, attached as Ex. D/3 to Grunschlag Decl. P & G also informed Dr. Lusk that it was "willing to provide [plaintiff] transitional work (day shift) for approximately 4 weeks if in your medical opinion he can return to full duty and rotate shifts with his team after that

---

**4.** Under length of accommodation Dr. Lusk wrote 7/20/98. While P & G was confused by this, as the length of accommodation was much shorter than before, it did not seek clarification from Dr. Lusk. Rather, it had plaintiff reevaluated by Dr. Meek. According to plaintiff, 7/20/98 was the return to work date.

time." *Id.* It is undisputed that Dr. Lusk never responded to this letter. In her declaration, Dr. Lusk states that "[a]ll I asked of Darlene Cooper at the time was to get Mr. Perez back to work so that we could see how he reacts and if he can be transitioned over time into his routine duties." Lusk Decl. ¶ 8. According to Lusk, she did not respond to the letter because, at that time, plaintiff had decided that he did not want to go back to P & G. Lusk Depo, 74:20–26.

P & G's last communication with plaintiff was a letter from Carol McKee, P & G's Industrial Relations Manager, dated August 5, 1998. In that letter, McKee states in pertinent part:

> This letter is in response to your request of a return to work date. It has been discussed with you, as well as Dr. Lusk, that we are unable to accommodate anyone permanently on day shift or design a job where one doesn't interact with chemicals. We discussed with Dr. Lusk that we are willing to return you to transitional work on day shift if she believes you can within a reasonable time frame return to core work and rotate 12 hour shifts with your team.
>
> We have requested additional clarity from Dr. Lusk regarding your restrictions and she agreed to address our concerns via FAX by 8/1/98. To date, we have not received this information. We also requested your authorization to allow Dr. Lusk to communicate medical information on a need to know basis with our medical representatives, Darlene Cooper, RN and Jeffrey Moy[,] MD. This same authorization would allow for Doug MacPherson and myself to discuss any work issues with Dr. Lusk as they occur. It is my understanding that you have refused to sign this statement. This authorization is critical to allowing you to return to work.

McKee letter, dated Aug. 5, 1998, attached as Ex. C/7 to Grunschlag Decl. It is undisputed that plaintiff never signed the authorization.

Dr. Lusk submitted additional physician's certificates that included transitional return to work plans with similar modifications in August, October, and December 1998 and January, April, and July 1999. Plaintiff tendered his resignation on August 19, 1999. His resignation date corresponded to the cessation of his disability payments and apparently was necessary for him to receive a distribution from his retirement plan.

### 6. Possible Reassignment Positions at P & G

P & G's Sacramento plant has a limited number of jobs that are worked primarily in eight-hour day shifts. These positions are known as "off-line rotational roles" which support the plant's "core" on-line production work. The off-line roles are not permanent and require the technicians to return to their core work after a maximum of three years. In addition, technicians are expected to maintain their core skills while in an off-line role by occasionally working in core production work with their teams and/or filling in for team members on vacation. Available off-line positions are posted in the plant, and current employees may apply. As discussed above, technicians at Step 2 or above in the disciplinary process are ineligible for off-line positions.

At least three off-line positions were posted in 1998. The position of Storeroom Business Coordinator was posted on March 3, 1998, was re-posted on April 21, 1998, and was not filled until approximately September 14, 1998. The Alcohol (Business) Coordinator position also opened in 1998. In addition, throughout 1998, a Technical Safety Coordinator position was

available. Each of these positions required an eight-hour shift and limited, if any, exposure to toxic chemicals.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party does not bear the burden of proof at trial, it may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once 'the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. v. Pacific Elec.*

*Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. Fed. R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 57 (2d Cir. 1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

## ANALYSIS

### 1. Preemption

As a preliminary matter, P & G contends that plaintiff's claims are preempted by Section 301 of the Labor Management Relations Act ("LMRA") because their resolution requires this court to interpret the selection guidelines which P & G contends are part of the collective bargaining agreement ("CBA").

 Section 301 of the Labor Management Relations Act ("LMRA") provides in pertinent part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court in the United States having jurisdiction of the parties without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Federal law exclusively governs a suit for breach of a CBA, as the Supreme Court has determined that the preemptive effect of Section 301 "is so powerful as to displace any state cause of action 'for violation of contracts between an employer and a labor organization.'" *Franchise Tax Bd. of the State of Calif. v.*

*Construction Laborers Vacation Trust for S. Calif.,* 463 U.S. 1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (quoting Section 301). Claims based on state law that are "inextricably intertwined with consideration of the terms of [a] labor contract," or "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract ... must either be treated as a Section 301 claim, ... or dismissed as preempted by federal labor-contract law." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 213 & 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (internal citation omitted).

■ In order to determine whether Section 301 preempts a state law claim, the court must consider:

(1)· whether the CBA contains provisions that govern the actions giving rise to a state claim, and if so, (2) whether the state has articulated a standard sufficiently clear that the state claim can be evaluated without considering the overlapping provisions of the CBA, and (3) whether the state has shown an intent not to allow its prohibition to be altered or removed by private contract. A state law will be preempted only if the answer to the first question is "yes," and the answer to either the second or third is "no."

*Miller v. AT & T Network Sys.,* 850 F.2d 543, 548 (9th Cir.1988) (footnote omitted); *see also Jimeno v. Mobil Oil Corp.,* 66 F.3d 1514, 1523–27 (9th Cir.1995) (applying *Miller* test).

■ In determining whether the CBA governs the actions giving rise to plaintiff's FEHA claim, "it is a claim's legal character, as *independent* of rights under the collective-bargaining agreement, that decides whether a state cause of action may go forward...." *Livadas v. Bradshaw,* 512 U.S. 107, 123–24, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (emphasis added) (internal citations omitted). The "right to be

free from discrimination ... *does* exist independently of private agreements and cannot be altered or waived." *Ramirez v. Fox Television Station, Inc.,* 998 F.2d 743, 749 (9th Cir.1993) (emphasis in original) (internal citation omitted). The FEHA creates non-negotiable state rights independent of rights under a CBA. *See Jimeno,* 66 F.3d at 1527 (holding the FEHA standard "provide[d] a means to determine 'reasonable accommodation' without reference to the CBA"); *Ramirez,* 998 F.2d at 748 (holding that "the rights conferred by the California Employment Act are 'defined and enforced under state law without reference to the terms of *any* collective bargaining agreement.'") (emphasis in original) (quoting *Chmiel v. Beverly Wilshire Hotel Co.,* 873 F.2d 1283, 1286 (9th Cir.1989)). When a CBA's meaning "is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be [preempted]." *Livadas,* 512 U.S. at 124, 114 S.Ct. 2068.

■ P & G contends that the selection guidelines provide it with a legitimate, non-discriminatory reason for failing to accommodate plaintiff's mental disability. According to P & G, the selection guidelines provide that employees at Step 2 or above in the disciplinary system are not eligible for a non-production (off-line) position. It is undisputed that plaintiff was at Step 2 of the disciplinary system as of April 11 and June 22, 1997, and at Step 3 as of July 10, 1997. Thus, according to P & G, it could not accommodate plaintiff by reassigning him to an off-line position as he was at Step 2 or above during the relevant time period.

Plaintiff does not quibble with P & G's interpretation of the CBA or the selection guidelines; rather, he argues that the selection guidelines and the CBA are simply

one of several factors for the court to consider in evaluating his claim. *See Barnett v. U.S. Air,* 228 F.3d 1105, 1119 (9th Cir.2000) (en banc), *cert. granted,* — U.S. ——, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001). The court agrees. The *meaning* of the selection guidelines are not the subject of dispute. While the analysis of P & G's FEHA defense requires the court to *consider* the guidelines, it does not require the court to *interpret* them.[5] Consequently, the answer to the first *Miller* question is no. Accordingly, Section 301 of the LMRA does not preempt plaintiff's FEHA claim.[6]

The same analysis applies to plaintiff's wrongful termination claim as it is prefaced on a violation of public policy, namely constructive termination based on mental disability. Plaintiff contends that P & G's failure to reasonably accommodate his mental disability led to his constructive termination. To the extent plaintiff argues that reassignment to an off-line position would have provided a reasonable accommodation, P & G may raise the selection guidelines as a defense. For the reasons set forth above, however, analysis of this defense does not require an interpretation of the selection guidelines. Accordingly, plaintiff's wrongful termination claim is not preempted.

**5.** *Sprewell v. Golden State Warriors,* 231 F.3d 520 (9th Cir.2000) is not contrary. First, unlike the instant action, *Sprewell* was steeped in the CBA, as the plaintiff had filed a grievance thereunder and sought to vacate an arbitration award rendered pursuant thereto. Second, and more importantly, *Sprewell* reaffirms that preemption comes into play when a claim or defense requires an interpretation of the CBA and the state law claim cannot be said to be independent of the CBA. The court's conclusion here is thus consistent with the court's holding in *Sprewell.*

**6.** Because the answer to the first *Miller* question is no, the court need not address the remaining *Miller* questions.

## 2. Discrimination Based On Disability (FEHA)

It is an unlawful employment practice "for an employer ... to fail to make reasonable accommodation for the known physical or mental disability of an ... employee," unless the employer is able to demonstrate that such accommodation would "produce undue hardship to its operation." Cal.Gov.Code § 12940(k) (West 1997). In order to establish a "reasonable accommodation" claim, plaintiff must show that he (1) "suffers from a disability covered by FEHA," and (2) is a qualified individual. *Jensen v. Wells Fargo Bank,* 85 Cal.App.4th 245, 256, 102 Cal.Rptr.2d 55 (2000). Unlike a traditional employment discrimination claim brought under subdivision (a), plaintiff need not establish that he suffered an "adverse employment action" due to his disability. "Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself". *Id.* (citing Cal. Gov.Code § 12940(k)).[7]

### a. "Mental Disability"

"Mental disability" "includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and

**7.** In his complaint, plaintiff cites to Cal.Gov. Code § 12940(a). As discussed above, however, the FEHA addresses reasonable accommodation in a separate subdivision, subdivision (k). Insofar as plaintiff appears to base his FEHA claim on P & G's alleged failure to reasonably accommodate his mental disability, his claim is properly analyzed under subdivision (k). Moreover, insofar as plaintiff contends that he was wrongfully terminated on account of his disability, a claim under subdivision (a) would be duplicative.

specific learning disabilities." Cal.Gov. Code § 12926(i) (West 1999). The parties do not dispute that plaintiff's bipolar disorder constitutes a "mental disorder" under FEHA. The court finds that plaintiff's post traumatic stress disorder also constitutes a mental disorder. *See Jensen*, 85 Cal. App.4th at 259, 102 Cal.Rptr.2d 55; *see also Mustafa v. Clark County Sch. Dist.,* 157 F.3d 1169, 1174–75 (9th Cir.1998) (per curiam).

However, the parties do dispute whether plaintiff must establish that his mental disorders limit one or more of his major life activities, and if so, to what degree they limit them. Under the ADA, both mental and physical disabilities must "substantially limit" one or more of the major life activities. 42 U.S.C. § 12102(2)(A). Unlike the ADA, the FEHA defines mental and physical disabilities separately. As it existed at the time the actions giving rise to plaintiff's claims for relief occurred, the FEHA provided in pertinent part:

> "Mental disability" includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
>
> . . . . .
>
> "Physical disability" includes ... any physiological disease, disorder, [or] condition ... that ... *[l]imits* an individual's ability to participate in major life activities.

Cal.Gov.Code § 12926(i), (k) (West 1999) (italics added). The California courts of appeal are split on whether a plaintiff must show the mental disorder limits a major life activity. One California court of appeal has held that the FEHA, like the ADA, requires that the mental disorder substantially limit one or more major life activities. *Muller v. Auto. of S. Cal.,* 61

Cal.App.4th 431, 442–443, 71 Cal.Rptr.2d 573 (1998). Another court of appeal has held that the plaintiff need only establish that he or she suffers from a mental disorder and need not show that the disorder limits his or her life in any way. *Pensinger v. Bowsmith, Inc.,* 60 Cal.App.4th 709, 722, 70 Cal.Rptr.2d 531 (1998).

This matter is further complicated by recent amendments to the FEHA. Effective January 1, 2001, the definition of "mental disability" was amended as follows:

> "Mental disability" includes, but is not limited to, all of the following: (1) Having any mental or psychological disorder or condition, such as mental retardation, organic brain syndrome, emotional or mental illness, or specific learning disabilities, that *limits* a major life activity. . . .

Cal.Gov.Code § 12926(i) (West 2001) (emphasis added).

 With respect to whether the FEHA, as it existed prior to the 2001 amendments, required a plaintiff to show that his or her mental disorder limits one or more of the major life activities, the court agrees with the decision in *Pensinger* and respectfully disagrees with the decision in *Muller,* and finds that prior to the 2001 amendments, a plaintiff was not required to show that his or her mental disorder limits, substantially or otherwise, one or more of the major life activities.[8] In reaching this same conclusion, the *Pensinger* court noted that although the definition of physical disability required that the physical disorder *limit* one of the major life activities, the definition of mental disability did not. The court further noted that while the Legislature amended the FEHA in 1992 to include "mental disabili-

---

**8.** "Where the state's intermediate appellate courts have reached conflicting results, the federal court must ascertain for itself the most

authoritative assessment of state law." *Air–Sea Forwarders v. Air Asia Co.,* 880 F.2d 176, 186 (9th Cir.1989).

ty" as one of the prohibited bases for discrimination in employment, it did not include the limitation requirement. Finding no ambiguity in the plain language of the statute, the *Pensinger* court held that an employee with a mental disorder need not show that such disorder limits one or more of his major life activities. The court finds this reasoning persuasive.

 Having addressed the state of the law prior to the 2001 amendments, the court must next determine whether the 2001 amendment requiring that a mental disorder *limit* one of the major life activities applies retroactively. The court finds it does not. A statute may be applied retroactively where the statute represents an attempt to clarify, rather than revise, a statute's true meaning. *Wittkopf v. County of Los Angeles,* 90 Cal.App.4th 1205, 109 Cal.Rptr.2d 543, 548 (2001). *Wittkopf* concerned amendments to the FEHA's definition of physical disability and the retroactivity of the same. As noted above, prior to the 2001 amendments, a plaintiff was required to show that a physical disorder "limits" his or her ability to participate in major life activities. In 2001, the Legislature added § 12926.1 which provides in pertinent part:

> [T]he Legislature has determined that the definitions of "physical disability" and "mental disability" under the law of this state require a "limitation" on a major life activity, but do not require, as does the Americans with Disabilities Act of 1990, a "substantial limitation." This distinction is intended to result in broader coverage under the law of this state than under that federal act.

Cal.Gov.Code § 12926.1(c). In finding the amendment applied retroactively, the court reasoned:

Because, both before and after its amendment in 2000, FEHA's definition of physical disability requires only a mere limitation, and not a substantial one, we conclude that the amendments and addition of section 12926.1 were intended only to clarify existing law on these points. Accordingly, because the essential meaning of the term "physical disability" has not changed, the recently clarified statute has no true retrospective effect.

*Id.* at 550 (internal footnote omitted). The same cannot be said with respect to the FEHA's definition of mental disability. As set forth above, prior to the 2001 amendments, FEHA's definition of mental disability did not require a limitation of any kind. As amended, FEHA's definition of mental disability requires a limitation. Accordingly, the meaning of the term mental disability has changed, and thus, the 2001 amendments are not a mere clarification as they apply to the definition of mental disability, and thus, apply prospectively only.[9]

**b. "Qualified Individual"**

 Having found that plaintiff suffers from a mental disability, the court must consider whether plaintiff was "qualified." "For purposes of a section 12940, subdivision (k) claim, the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position." *Jensen,* 85 Cal.App.4th at 256, 102 Cal.Rptr.2d 55.

P & G argues that plaintiff was not qualified because (1) he was not eligible for a non-production/off-line position based on

---

9. Because the court finds that plaintiff's actual disability places him within the class of persons protected by the FEHA, the court need not address whether P & G also "regarded" plaintiff as disabled. *See Wittkopf,* 109 Cal.Rptr.2d at 543 n. 3.

his disciplinary status, and (2) he could not perform the essential functions of a non-production/off-line position as all such positions required occasional work in the employee's core position and some handling of toxic chemicals.

■ . As discussed above, technicians at "Step 2 and above" in the disciplinary process are not eligible for off-line positions. Plaintiff was at Step 3 when he left P & G on July 10, 1997. Where an employee's disciplinary status is due to the disability sought to be accommodated, the disciplinary status cannot serve as a basis for denying a reasonable accommodation. *See Humphrey v. Mem'l Hosps. Ass'n,* 239 F.3d 1128, 1137 (9th Cir.2001) (holding that "[i]t would be inconsistent with the purposes of the ADA [and the FEHA] to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated.")

■ There is evidence in the record upon which a reasonable juror could find that plaintiff's disciplinary status was a result of his mental disorders. Plaintiff had been employed by P & G for over 20 years without incident. Moreover, the disciplinary actions taken against him occurred within a period of three months, two, just prior to plaintiff's mandatory referral to the EAP, and one, days thereafter. The record also contains evidence that plaintiff's mood swings significantly increased in severity during 1997. Plaintiff's symptoms included significant sleep disturbances, erratic behavior and irritability. The actions for which plaintiff was disciplined—sleeping on the job, leaving his workstation unattended, and disrespecting his co-workers—could each be described as directly related to plaintiff's symptoms. Accordingly, a triable issue of fact exists as to whether plaintiff's disci-

plinary status was due, at least in part, to his bipolar and/or post-traumatic stress disorders, and thus, plaintiff's disciplinary status is not a sufficient basis upon which to grant summary judgment of plaintiff's FEHA claim.

■ Even so, P & G argues that summary judgment is still appropriate because plaintiff could not perform the essential functions of a non-production/off-line position. According to Dr. Lusk, plaintiff could not handle toxic substances or work more than eight hours a day for a certain period of time.[10] According to P & G, all off-line positions required occasional work in the employee's core position and some handling of toxic chemicals, and thus, plaintiff's modifications prevented him from performing the essential functions of these positions.

> [A]ssuming the employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal, interactive process broke down because the employee failed to engage in discussions in good faith.

*Jensen,* 85 Cal.App.4th at 263, 102 Cal. Rptr.2d 55.

*(1) Was a reasonable accommodation offered and refused?*

P & G initially accommodated plaintiff's disability by placing him on disability

---

**10.** As set forth above, the recommended length of these accommodations is not clear.

leave. While Dr. Lusk initially certified plaintiff to return to work as early as March 1998 with certain modifications, it is undisputed that plaintiff was not ready to return to work until at least May 1998. By at least July 1998, P & G was aware of plaintiff's desire to return to work as well as his required modifications. At this point, P & G sent plaintiff to Dr. Meek for re-evaluation. When plaintiff contacted P & G regarding his start date, he was told not to report to work as his case was still under review. On July 27, 1998, however, plaintiff went to the plant with his union representatives and was told to leave. In late July and early August 1998, P & G offered plaintiff the following "accommodation:" he could return to his job after a transition period of approximately four weeks during which he would work under the limitations suggested by his doctors, provided (1) Dr. Lusk approved the plan, and (2) plaintiff authorized her to communicate with P & G representatives on a need to know basis. It is undisputed that plaintiff refused to authorize Dr. Lusk to communicate with P & G regarding his condition. P & G argues that once plaintiff refused to sign the authorization, there was nothing else it could do, as communication with Dr. Lusk was critical to plaintiff's return.

During oral argument, plaintiff's counsel conceded that P & G's demand for a medical authorization was reasonable. The issue here is whether plaintiff's refusal to sign such an authorization in August 1998 discharged P & G, as a matter of law, from any further obligation to engage in the interactive process. The court finds it did not. First, plaintiff's refusal must be viewed in light of his mental disability and the circumstances leading up to his refusal. Plaintiff's mental disorders caused him to experience severe mood swings and to engage in erratic behavior. P & G was well aware of this based on Dr. Meek's reports and plaintiff's behavior at work during the

months preceding his disability leave. Second, Dr. Lusk continued to submit physician's certificates to P & G for nearly a year after plaintiff refused to sign the authorization. Each of these certificates indicated that plaintiff could return to work with the same modifications as previously set forth. Against this backdrop, a reasonable juror could find that P & G's obligation to engage in the interactive process was not forever discharged by plaintiff's refusal to sign the authorization in August 1998, and that its offer of an accommodation in July/August 1998 was not a reasonable accommodation.

*(2) Was there a vacant position for which plaintiff was qualified and capable of performing?*

It is undisputed that at least three off-line positions were, or became, available during the time plaintiff was released and ready to return to work. P & G argues that plaintiff was not qualified to fill these off-line positions because each involved some 12-hour rotating shifts and some exposure to chemicals. While plaintiff's required job modifications did not match perfectly with the requirements of the off-line positions, P & G never asked plaintiff or Dr. Lusk whether plaintiff's required modifications allowed for occasional 12-hour shifts and/or occasional handling of toxic substances. Indeed, Dr. Lusk has declared, albeit after the fact, that she would have found these positions suitable for plaintiff had she been made aware of them. Accordingly, at a minimum, a triable issue of material fact exists as to whether vacant positions existed at P & G for which plaintiff was qualified and capable of performing.

*(3) Did P & G do everything in its power to find a reasonable accommodation?*

P & G is entitled to summary judgment if it is able to establish that "it did

**1124**

everything in its power to find a reasonable accommodation, but the informal, interactive process broke down because [plaintiff] failed to engage in discussions in good faith." *Jensen,* 85 Cal.App.4th at 263, 102 Cal.Rptr.2d 55. Clearly, the interactive process broke down in August 1998. The issue is who was to blame. P & G contends that plaintiff was to blame based on his refusal to sign the authorization and Dr. Lusk's failure to respond to P & G's July 31, 1998 fax.

As set forth above, plaintiff's refusal must be viewed in light of the surrounding circumstances, including his mental disorders and the types of behavior associated therewith. The court must also consider the fact that Dr. Lusk continued to submit physician's certificates to P & G for nearly a year following plaintiff's refusal. While a reasonable juror could conclude that plaintiff acted in bad faith in refusing to sign the authorization, a reasonable juror could also conclude that, given the circumstances, P & G was obligated to do more. Based on the above, the court cannot find as a matter of law that P & G "did everything in its power to find a reasonable accommodation," or that plaintiff was responsible for the breakdown in the interactive process.

**2. Wrongful Termination In Violation Of Public Policy**

■ Plaintiff also contends that he was constructively discharged in violation of public policy. In order to prevail on his wrongful termination claim, plaintiff must show that (1) P & G unlawfully discriminated against him on account of his disability, and (2) he was forced to resign as a result of thereof. *See City of Moorpark v. Superior Court,* 18 Cal.4th 1143, 1158–59, 77 Cal.Rptr.2d 445, 959 P.2d 752 (1998) (holding disability discrimination can form the basis of a common law wrongful termination claim). As set forth above, triable issues of material fact exist as to the first

prong. Thus, the issue is whether plaintiff was constructively discharged or voluntarily resigned in August 1999.

■ "[C]onstructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Thomas v. Douglas,* 877 F.2d 1428, 1434 (9th Cir.1989) (internal quotations and citations omitted). "The determination of whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a question fact." *Id.*

■ Plaintiff contends that he was forced to resign on August 19, 1999 due to P & G's failure to offer him a reasonable accommodation and/or engage in the interactive process. Given the incident at the plant in July 1998 and the lack of communication between August 1998 and August 1999, plaintiff concluded that P & G was never going to allow him to return, and that he had no choice but to resign, as his disability payments were about to cease. A reasonable juror could conclude that plaintiff's belief was reasonable.

**CONCLUSION**

Defendant P & G's motion for summary judgment is DENIED. A status conference is set in this matter for October 4, 2001 at 10:00 a.m. The parties shall submit a joint status conference statement not later than September 25, 2001.

IT IS SO ORDERED.