**Gilbert R. DIAZ, II, an individual, Plaintiff,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

No. CV 03–4765 SVW (AJWx).

United States District Court, C.D. California.

June 21, 2005.

Andre E. Jardini, Knapp Petersen & Clark, Glendale, CA, for Plaintiff.

David S. Wilson, III, Jay L. Grytdahl, Federal Express Corporation, Memphis, TN, Keith A. Jacoby, Traci Irene Beach, Littler Mendelson, Los Angeles, CA, for Defendant.

AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT FEDERAL EXPRESS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION.

WILSON, District Judge.

## I. INTRODUCTION

Originally filed in California Superior Court on May 30, 2003, this action alleges wrongful termination in violation of public policy; disability discrimination in violation of Cal. Gov't Code § 12940(a); failure to provide a reasonable accommodation for a disability in violation of Cal. Gov't Code § 12940(m); breach of contract; breach of the implied covenant of good faith and fair dealing; deceit; and violation of Cal. Bus. & Prof.Code § 17200. Plaintiff Gilbert R. Diaz, II, ("Plaintiff") seeks damages from Defendant Federal Express Corporation ("Defendant" or "Federal Express") consisting of special damages for the loss of past and future income, medical expenses, and other benefits; prejudgment interest on these sums; general damages for emotional distress; punitive damages; attorneys' fees; costs of suit; and any other relief the Court may deem appropriate.

This action was removed to this Court on July 3, 2003 pursuant to 28 U.S.C. § 1441. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332, as there is complete diversity of the parties and the amount in controversy exceeds $75,000.

Now before the Court is Defendant Federal Express Corporation's Motion for Summary Judgment or Summary Adjudication made pursuant to Fed.R.Civ.P. 56 on the ground that there is no genuine issue of material fact with respect to each of Plaintiff's causes of action in the initial complaint and that Defendant is entitled to judgment as a matter of law on such claims. In the alternative, Defendant

seeks summary adjudication that the following issues are without controversy: (1) Defendant is entitled to summary judgment on Plaintiff's first cause of action for wrongful termination, and (2) Defendant is entitled to summary judgment on Plaintiff's third cause of action for failure to accommodate.

Due to the legal and factual complexities of this case, the Court has held several hearings on Defendant's Motion and has ordered multiple rounds of briefing. On August 18, 2004, the Court issued an Order directing the parties to submit further briefing on the question of whether Plaintiff's condition constitutes a "disability" for purposes of the California Fair Employment and Housing Act ("FEHA"). In the August 18 Order, the Court concluded that if Plaintiff could have a mental disability under the FEHA, Defendant's Motion for Summary Judgment must be denied, and if Plaintiff did not have a mental disability under the FEHA, Defendant's Motion for Summary Judgment must be granted. Having fully considered the parties' filings, the Court issues this Order GRANTING IN PART AND DENYING IN PART Defendant's Motion for Summary Judgment.

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. Plaintiff's Employment Position

Beginning on March 3, 1992, Plaintiff was employed as a customer service agent ("CSA") for Defendant, a company engaged in the overnight shipping business.[1] Generally, CSAs' responsibilities are threefold, as they: (1) greet customers, assisting them in preparing goods and documents for shipment, and accepting payment for shipment services; (2) scan customers' packages into Defendant's com-

puter system so that they can be traced to their ultimate destinations; and (3) sort packages into groups based on each package's destination, which must be done correctly to ensure a package arrives at its intended destination on time.

Defendant states that appropriate staffing levels are necessary for Defendant to meet its service commitments and, in turn, to maintain its competitive advantage. The parties dispute the extent to which a CSA's absence requires a replacement CSA and the difficulty of finding a replacement CSA. However, it is clear that unfamiliarity with the sorting process can easily cause packages to be delivered to the wrong location, and, thus, it would presumably be problematic for Defendant if a replacement CSA or other knowledgeable person was not available to substitute for an absent CSA.

### B. Defendant's Disciplinary Procedures

Defendant maintains several procedures for disciplining employees. Defendant's most serious form of written discipline, short of termination, for conduct issues is a warning letter. A warning letter may sometimes be accompanied by suspension without pay. Defendant's most serious form of written discipline, short of termination, for performance related issues is a performance reminder. For conduct or performance related problems that are not deemed severe enough to justify a warning letter or a performance reminder, Federal Express managers are authorized to issue a "documented counseling." If an employee receives a combination of three warning letters and performance reminders within a twelve month period of time, this will "normally" result in termination.[2]

---

**1.** During the period of time relevant to this action, Plaintiff worked five hours per day, five days per week, for a total of twenty-five hours per week.

**2.** Plaintiff contends that under Defendant's policy, a third warning letter or performance reminder always results in termination. Defendant refutes this contention, citing multi-

Employees can appeal from a warning letter, performance reminder, and a decision to terminate employment via the Guaranteed Fair Treatment Procedure ("GFTP"). The GFTP, which is set forth in Defendant's employee manual entitled "The People Manual," provides for a three step appeal. The first step consists of a meeting attended by the employee, a human resources ("HR") representative, and the employee's operations manager, senior manager, and managing director. The managing director decides the appeal based upon both information presented by the employee before and during the meeting and information in the employee's GFTP packet. A GFTP packet, which is submitted by the operations manager and senior manager, contains the employee's disciplinary history and the rationale for the discipline at issue. The managing director and the HR representative then each prepare a document outlining the managing director's rationale for the decision.

If the employee is unsatisfied with the decision made at Step 1, the employee can proceed to Step 2. At Step 2, the employee completes a form in which the employee may submit additional information. The decision at Step 2 is made by the Vice President and Senior Vice President in the employee's direct chain of command based upon the evidence presented during Step 1, the rationale for the Step 1 decision as reported by the managing director and the HR representative, and any additional information submitted by the employee.

If Step 2 is decided against the employee, the employee may appeal to Step 3, at which time the employee completes another form inviting the employee to provide additional information. The decision at Step 3 is made by an Appeals Board com-

prised of various members of upper management. The Appeals Board considers all of the evidence presented at Steps 1 and 2, plus any additional information that the employee presents.

*C. Plaintiff's Performance Through February 2001*

Plaintiff's performance over his first nine years with Federal Express appears to be mixed. On one hand, Plaintiff received good to excellent reviews averaging approximately six on a scale of seven during his employment. In the course of his employment, he received a number of "Bravo Zulu's" (a company commendation for extraordinary performance) and numerous compliments from customers.

On the other hand, through February 2001, Plaintiff received a performance reminder (for "missed freight") and three warning letters (two for attendance related matters and one for using inappropriate language toward a coworker). During this time period, Plaintiff also received nineteen documented counselings. The documented counselings were issued for a range of reasons, including behaving rudely, improperly processing packages, and for having a $1.00 cash shortage.

*D. Plaintiff's Warning Letter of April 2, 2001 for Confrontation with Coworker*

On February 6, 2001, Plaintiff was terminated for "lack of professionalism" as a result of a confrontation he had with a coworker. Plaintiff appealed from the termination via the GFTP, and his termination was overturned at Step 3 on March 29, 2001. However, the Appeals Board ordered local management to issue a warning letter to Plaintiff and suspend him for

ple statements in the record that the third letter or reminder "normally," but does not always, result in termination. Rather, according to Defendant, three letters or reminders triggers an investigation of the employee's entire employment history.

a week without pay. Pursuant to this directive, a warning letter was issued to Plaintiff on April 2, 2001.

Upon serving his suspension, Plaintiff returned to work, but was not allowed to return to his customary work group. Rather, Plaintiff's senior manager, his second level supervisor Rosalinda Vint ("Vint"), transferred Plaintiff to another group, in which capacity Plaintiff earned less pay and worked fewer hours.

Plaintiff's operations manager in the new work group was Clementine Aubrey ("Aubrey"). Plaintiff states that Aubrey relentlessly complained about Plaintiff's performance.

### E. Performance Reminder of June 25, 2001 for Failure to Properly Input Timecard Information

On June 1, 2001, Aubrey issued a memo entitled "Performance Expectations" to all of the CSA's under her supervision, including Plaintiff. The memo stated that CSA's were expected to utilize Defendant's "tracker" system to input timecard information into Defendant's computer system. Plaintiff acknowledged reading this memo by signing it on June 12, 2001. In addition, on June 4, 2001, Aubrey performed a "checksit" with Plaintiff during which she observed Plaintiff perform his job. On the checksit form, Aubrey noted that Plaintiff's timecards were missing the "tracker" labels. Plaintiff acknowledged that he had read the checksit form by signing it on June 4, 2001.

On June 25, 2001, Plaintiff received a performance reminder after Aubrey discovered that Plaintiff was not inputting his timecard information via the "tracker" system, but rather, was continuing to manual-ly input his time into Defendant's computer system.

### F. Plaintiff's Attendance Through December 4, 2001

Under Defendant's policy, all absences, even if the employee is disabled due to a work related injury and has filed a workers' compensation claim, are counted against the employee with regard to discipline and termination. Indeed, Defendant's ordinary practice is not to inquire about the reasons for an employee's absence before issuing a performance reminder or warning letter. If an employee is absent from work on workers' compensation for a work-related disability, Defendant counts all absences against the employee and gives the employee a warning letter because of excessive absences.

In June 2001, Plaintiff missed nine full days of work and left work early on an additional day.[3] All of Plaintiff's absences were on account of his not feeling well. Specifically, Plaintiff states that he experienced physical symptoms, including severe gastric distress requiring an emergency room visit on June 19, 2001. Additionally, Plaintiff was experiencing feelings of anxiety and depression, was fearful of dealing with his supervisors, and had difficulty concentrating.

On July 17, 2001, Aubrey issued Plaintiff a documented counseling because his attendance level was unsatisfactory on account of his June absences as well as three absences he had in 2000. In the documented counseling, Aubrey warned Plaintiff that if his attendance level was again deemed unsatisfactory, he would be issued a performance reminder.

---

**3.** Plaintiff was absent from work on June 7, 18, 19, 20, 21, 22, 26, 27, and 28. On June 15, Plaintiff left work early.

From June 28, 2001 through December 4, 2001, Plaintiff did not miss any of his scheduled shifts due to illness, though he did take his ten allotted vacation days. Nonetheless, Plaintiff states that he continued to experience job stress, anxiety and depression, an assertion that is supported by the report of psychiatrist Alfred M. Bloch (discussed *infra* at 9–11).

### G. Plaintiff's Workers' Compensation Claim and Dr. Bloch's Report

On July 31, 2001, Plaintiff filed a workers' compensation claim for "emotional stress" suffered between February 15, 2001 and July 26, 2001.

Defendant is a self-insured employer with respect to workers' compensation claims. Sedgwick Claims Management Services, Inc. ("Sedgwick") is the third party administrator of workers' compensation claims brought against Defendant. When Plaintiff filed his workers' compensation claim, Sedgwick assigned the claim to Thelma Calvo ("Calvo"), a claims administrator for Sedgwick, and hired Kathleen Brundo ("Brundo") to defend Defendant against the claim. Sedgwick later reassigned the claim to another claims administrator, Melynda Ewald ("Ewald"), when Calvo moved to Northern California. Stephen Schempp ("Schempp"), a Claims Administrator in Defendant's Risk Management Department, was responsible for overseeing the activities of Ewald and Brundo relative to the claim.

Aubrey, Vint, and HCMP manager Nancy Hanlon ("Hanlon") learned in August, 2001 that Defendant had filed a claim for workers' compensation. Because Plaintiff chose to file his claim through his attorney rather than through local management and because, according to Vint, Aubrey, and Hanlon, Defendant did not report his alleged injury to them, none of Plaintiff's supervisors obtained any specific information about Plaintiff's injury at that time.

On October 2, 2001, Sedgwick sent Plaintiff to Dr. Howard M. Greils for a psychiatric evaluation. Dr. Greils concluded that Plaintiff "has not experienced a psychiatric disorder or functional impairment as a result of the job events that he reports." (Schempp Supp. Decl., Exh. A at 17). Dr. Greils further concluded that Plaintiff "may continue at his usual occupation without restrictions from a psychiatric standpoint." (*Id.* at 18).

On November 7, 2001, Plaintiff was examined by Dr. Bloch, a psychiatrist to whom he had been referred by his workers' compensation attorney. In connection with that examination, Dr. Bloch prepared a medical report reflecting his medical opinion concerning Plaintiff's psychiatric condition. After detailing Plaintiff's self-reported "history of present illness," Dr. Bloch reported the results of seven psychological tests administered by Dr. Dobbs. Among the findings garnered from these tests were: (1) a moderate level of depression; (2) moderate level of anxiety; and (3) that Plaintiff is "a naively defensive individual who is unwilling to admit to the minor faults and shortcomings which most people have." (Bloch Decl., Exh. 213 at 9).

In light of the test results and his clinical impressions, Dr. Bloch diagnosed Plaintiff as suffering from Adjustment Disorder with Mixed Anxiety and Depressed Mood and with psychological factors affecting his medical condition. Dr. Bloch found that Plaintiff's condition arose from the harassment he suffered at work. As a result of his depression, Plaintiff was limited in his life activity in that Plaintiff was sleeping poorly and suffering from fatigue, had become socially withdrawn, had suffered a loss of self-confidence and self-esteem, and was experiencing difficulty concentrating. Accordingly, Dr. Bloch found Plaintiff to be "temporarily totally

disabled" and suggested that Plaintiff should be transferred away from his manager and second level supervisor. (*Id.* at 12). Specifically, Dr. Bloch stated:

> Mr. Diaz has described what I believe most observers would consider a hostile work environment. In response to this, he has developed reactive psychiatric symptomatology.... The patient is struggling to continue work, hoping to "hang on" until he can transfer elsewhere within Federal Express. It would seem [to] be in the best interest of all parties to expedite a transfer away from his current manager and second-level supervisor.... The best intervention from a psychiatric viewpoint ... would be a lateral transfer away from his current manager and second level supervisor. As long as this hostile work situation persists, the patient will remain symptomatic.

(*Id.* at 12–13). Dr. Bloch further stated that although "[t]he overall residual disability would be ratable at this point between slight and slight to moderate, according to Workers' Compensation guidelines," Plaintiff's "degree of depression at present is such that it greatly limits [his] ability to engage in the goal directed activities that would be expected of any employee." (*Id.* at 13).

Dr. Bloch's report was served on Sedgwick and Brundo on December 21, 2001. In turn, on February 10, 2002, Brundo mailed Dr. Bloch's report to Schempp and

Debra Skelton ("Skelton"), a claims specialist in Defendant's Risk Management Department assigned to California claims. Pursuant to an Addendum to Defendant's contract with Sedgwick ("Addendum"), Schempp and Skelton were two of only sixteen Federal Express employees authorized to receive medical information concerning a workers' compensation claim from Sedgwick or its agents.[4] Indeed, Calvo and Ewald each state that they did not discuss any of the contents of Dr. Bloch's report with any of Defendant's employees besides Schempp, nor did they provide copies of Dr. Bloch's report to anyone at Federal Express. Moreover, Brundo attests that she did not provide a copy of Dr. Bloch's report to anyone at Federal Express other than Schempp and Skelton.

According to Schempp and Skelton, they were the only Federal Express employees to receive a copy of Dr. Bloch's report prior to Plaintiff filing this lawsuit. Schempp and Skelton each attest that neither provided a copy of either Dr. Greils' or Dr. Bloch's report to front line management (i.e. Vint, Aubrey, and Hanlon). Indeed, Skelton states that since Cal. Labor Code § 3762[5] became effective, she has not provided medical reports of any kind to Defendant's front line management.

Dale Springfield ("Springfield"), a manager in Defendant's workers' compensation department, summarizes Defendant's poli-

---

4. The other fourteen employees also administered workers' compensation claims, but did not receive Dr. Bloch's report because they were not involved with Plaintiff's workers' compensation claim.

5. Prior to January 1, 2003, Cal. Labor Code § 3762 stated in relevant part:

> (c) An insurer, third-party administrator retained by a self-insured employer pursuant to Section 3702.1 to administer the employer's workers' compensation claims, and those employees and agents specified by a self-insured employer to administer the employer's workers' compensation claims, are prohibited from disclosing or causing to be disclosed to an employer, any medical information ... about an employee who has filed a workers' compensation claim, except as follows:
>
> (2) Medical information regarding the injury for which workers' compensation is claimed that is necessary for the employer to have in order for the employer to modify the employee's work duties.

cy with regard to its claims administrators' conveying medical information to Defendant's front line management, as follows:

> When it is necessary for a Risk Management claims administrator and/or claims specialist to provide medical information arising out of a workers' compensation claim to front line management in order for the employee's work duties to be modified, only the recommended job modifications and/or work restrictions are furnished by the claims administrator and/or claims specialist assigned to the claim to front line management. Due in part to Labor Code § 3762, information concerning the employee's diagnosis and symptoms is not provided to front line management.

(Springfield Decl. at ¶ 2).

Similarly, in her deposition, Springfield stated that if a member of Federal Express' workers' compensation department had a request for an accommodation presented to him, that person may provide such a request to management with the following qualification: "If [a request for accommodation] involves job duties, modification and it's a compensable claim, the third-party administrator would communicate that information as long as it did not violate any privacy statutes. In particular, you know, Labor Code 3762." (Springfield Depo. at 39:24–40:3). Later, when asked what people like Schempp and Skelton are instructed to do when they come across a request for accommodation in a workers' compensation case, Springfield stated: "They would pass that information on or ensure that the TPA had passed the information on as long as it didn't violate any privacy regulations." (*Id.* at 40:19–21).

Plaintiff does not dispute Defendant's assertions that neither Aubrey, Vint, nor Hanlon saw Dr. Bloch's report, that Plaintiff did not furnish them with such report, and that Plaintiff did not request to them that he be transferred to another work location. Additionally, Plaintiff does not dispute Defendant's claim that Plaintiff did not furnish his HR representative, Elizabeth Steffey, with a copy of Dr. Bloch's report and that he did not request a transfer to another job location during his GFTP appeal. While Plaintiff does not concede that these Federal Express employees were not aware of Dr. Bloch's report, there is nothing in the record that indicates otherwise.

The workers' compensation claim was resolved on July 1, 2003 pursuant to an Order Approving Compromise & Release. The parties settled the case for $5000 plus $750 in attorneys' fees. The settlement agreement explicitly limits the scope of the settlement to "issues relating to workers comp. claims only. Notwithstanding any provision of this settlement which could be construed to the contrary, the parties agree this settlement applies only to rights and benefits under the Workers' Compensation laws." (Schempp Decl., Exh. A). Defendant emphasizes that this settlement does not constitute an admission of liability and that Plaintiff's claim was never accepted as compensable.

### H. Performance Reminder of January 14, 2002 for Attendance Deficiencies and Simultaneous Termination

On December 5, 2001, Plaintiff telephoned Aubrey and informed her that he would not be able to work his scheduled shift because he was not feeling well. The following day, December 6, 2001, Plaintiff again called in sick. On that same day, having sought treatment under the Federal Express Employee Assistance Plan, Plaintiff attended an appointment with Dr. Diane Kelley ("Dr. Kelley"), a licensed clinical psychologist. As a result of this examination, Dr. Kelley sent a letter to Aubrey, dated December 7, 2001, advising her that

Plaintiff should not work until December 14, 2001 because "he appears to be suffering from DSM IV Code 296.23." [6] (Diaz Decl, Exh. 14). Thus, in addition to missing work on December 5 and 6, Plaintiff also was absent from work on December 7, 8, 10, 11, 12, and 13.

On December 13, 2001, Plaintiff saw Dr. Kelley again. Following this appointment, Dr. Kelley sent a letter to Aubrey, dated December 14, 2001, in which Dr. Kelley stated that Plaintiff continued to suffer from DSM IV Code 296.23 and that he should be kept off of work until December 21, 2001. (Diaz Decl., Exh. 15). Plaintiff then missed his scheduled shifts on December 14, 17, 18, 19, 20, and 21. In total, Plaintiff missed fourteen days due to illness in December 2001. According to Defendant, these absences were particularly problematic in that December is Defendant's "peak season."

In late December, Plaintiff, believing that he could perform his duties, attempted to return to work. However, Aubrey informed Plaintiff that he could not return to work unless he had another note from Dr. Kelley. Because Dr. Kelley was on vacation, Plaintiff was not able to obtain such a letter from her until January 3, 2002. On January 3, 2002, Plaintiff, believing that he was fully capable of performing his duties and in possession of a letter from Dr. Kelley stating such, attempted to return to work. However, upon arriving at work, Plaintiff was suspended by Aubrey.

Subsequently, on January 14, 2002, Plaintiff received a performance reminder for an attendance level that was well below satisfactory due to his absences in June and December. Specifically, Plaintiff's attendance rating was 95.5%, while Defendant's corporate minimum standard

for attendance was 96.9%. The performance reminder, signed by Aubrey, informed Plaintiff that his employment was terminated. In addition to citing Plaintiff's attendance deficiencies, the performance letter noted that a combination of three performance reminders and warning letters within a twelve month period "normally results in termination" and that this was the third such document issued to Plaintiff within a year. (Diaz Decl., Exh. 33). The decision to terminate Plaintiff was made by Aubrey and endorsed by Vint.

*I. Plaintiff's Appeals*

Plaintiff appealed his termination via the GFTP, submitting multiple statements in support thereof. Defendant maintains that it strictly followed the GFTP process as described above. Though Defendant understood that there were many favorable aspects of Plaintiff's performance, the decision to terminate Plaintiff's employment was upheld at all three steps of the GFTP. The GFTP appeal was ultimately decided by the highest level of Defendant's management, including the CEO, COO, the chief human resources director, a senior vice president, and a vice president, in Defendant's home office in Memphis, Tennessee. According to Steffey, at no point in the GFTP process did Defendant mention his workers' compensation claim. Moreover, Plaintiff did not submit Dr. Bloch's report at any stage of the GFTP.

Plaintiff contends that the only item considered in connection with his termination was his attendance history, a charge that Defendant vigorously denies, stating that Plaintiff's entire disciplinary history was considered at all three steps of the GFTP. Following the rejection of his GFTP ap-

---

**6.** DSM IV Code 296.23 is the code in the Diagnostic and Statistical Manual for major depressive order, single episode, severe with-

out psychotic features. Aubrey understood that the code related to depression.

peal, Plaintiff timely filed a charge of discrimination on the basis of disability concerning his termination with the California Department of Fair Employment and Housing. Plaintiff subsequently obtained a notice of the right to sue in California Superior Court, pursuant to California Government Code section 12965(b). After this action was brought in California Superior Court, Defendant removed the suit pursuant to 28 U.S.C. §§ 1332 and 1441.

### J. The Court's August 18, 2004 Order Re Further Briefing

On August 18, 2004, the Court issued its Order Re Further Briefing, in which the Court ORDERED the parties to submit further briefing on the issue of whether a temporary disability can, as a matter of law, constitute a disability for purposes of the FEHA.

In the August 18, 2004 Order, the Court made several rulings regarding Defendant's Motion for Summary Judgment. First, the Court held that under relevant principles of agency law in conjunction with Cal. Labor Code § 3762, questions of fact remained with respect to whether Dr. Bloch's report contained medical information necessary for Defendant to modify Plaintiff's work duties, and whether "in good faith and [in] the exercise of ordinary care," Schempp and Skelton ought to have disclosed certain portions of Dr. Bloch's report to Defendants and, if so, which portions. (*See* August 18, 2004 Order at 19–29).

Second, the Court held, in connection with Plaintiff's FEHA claim for failure to accommodate in violation of Cal. Gov't Code § 12940(m), that questions of fact remained as to whether any failure to accommodate on the part of Defendant was "based upon a bona fide occupational qualification," and whether Defendant could have made a reasonable accommodation

for Plaintiff. (*See* August 18, 2004 Order at 33–39).

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001)

(the nonmoving party must offer specific evidence from which a reasonable jury could return a verdict in its favor).

### B. Whether Plaintiff's Condition Qualifies as a "Disability" under the FEHA

#### 1. ADA Definition of "Disability"

Defendant argues that because Plaintiff's disability, which lasted from approximately June 2001 to early January 2002, was only temporary, Plaintiff did not suffer from a disability cognizable under the FEHA. Defendant urges the Court to determine whether Plaintiff had a "disability" by looking to ADA caselaw and regulations because "[t]here are not any published cases interpreting the FEHA that address whether or not a temporary condition can constitute a disability." (Def. Reply at 1).

Under the ADA, "disability" is defined as "a physical or mental impairment that *substantially limits* one or more of the major life activities of the individual." 42 U.S.C. § 12102(2)(A) (emphasis added). The applicable federal regulations list three factors to be considered in determining whether an individual is substantially limited in a major life activity: "(i) The nature and severity of the impairment; (ii) The *duration or expected duration* of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2) (emphasis added).

The Ninth Circuit has relied on this language in finding that an employee's cancer-related psychological impairment that lasted for a period of approximately three and a half months was not of sufficient duration to qualify as a "disability" under the ADA. *See Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351 (9th Cir.1996). In the *Sanders* court's view, a three and a half month "psychological impairment . . .

with no residual effects" was not of sufficient duration to substantially limit one or more of the plaintiff's major life activities.

It is unclear that temporary disabilities are categorically excluded even under the federal ADA standard. Defendant relies on *Wilmarth v. City of Santa Rosa*, 945 F.Supp. 1271 (N.D.Cal.1996), and *Sanders* for this proposition. However, Defendant's interpretation of these cases is flawed. In both *Wilmarth* and *Sanders*, the Ninth Circuit held that the temporary disability at issue did not constitute a disability for purposes of the ADA. In both cases, the fact that the disability was temporary was not dispositive. Rather, the court in both cases analyzed the statutory definition of "disability" under the ADA and concluded that the impairments did not satisfy the statutory definition. In conducting their analysis, both courts considered "the duration or expected duration of the impairment" as but one of three factors outlined in the statute. After analyzing all three factors, both courts held that the alleged disabilities did not "substantially limit" the plaintiffs from performing a major life activity and therefore did not constitute "disabilities" under the ADA. Thus, the Ninth Circuit has not categorically excluded temporary disabilities from coverage under the ADA.

Looking to other circuits reveals that there is some uncertainty with respect to whether a temporary disability, as a matter of law, cannot constitute a disability under the ADA. In *Aldrich v. Boeing Co.*, 146 F.3d 1265 (10th Cir.1998), the Tenth Circuit emphasized the importance of engaging in a case-by-case analysis of each impairment:

> Whether an impairment "substantially limits" a major life activity depends on the individual and the impairment. Such determinations are not susceptible to per se rules; they must be made on a

case-by-case basis. See 29 C.F.R. pt. 1630 app., § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"). The regulations and the EEOC's interpretive guidelines clearly state that an impairment need not be permanent in order to rise to the level of a disability. See *29 C.F.R. § 1630.2(j)(2)(iii)* (sic); EEOC Compliance Manual § 902.4(d), at 902–30.

*Id.* at 1270.

Moreover, in *Adams v. Citizens Advice Bureau,* 187 F.3d 315 (2d Cir.1999), the Second Circuit left open the question of whether temporary injuries are per se unprotected under the ADA:

> The Magistrate Judge's report and recommendation, adopted by the district court, engages in a case-specific analysis to determine whether this plaintiff was substantially limited in a major life activity by his temporary injury. As a result, we have no occasion to consider whether temporary injuries are per se unprotected under the ADA. Compare *Graaf v. North Shore Univ. Hosp.,* 1 F.Supp.2d 318, 321 (S.D.N.Y.1998) (sic) and *Davis v. Bowes, 1997 U.S.Dist. LEXIS 16258,* No. 95 Civ. 4765, 1997 WL 655935, at *15 (S.D.N.Y. Oct.20, 1997) (sic), with *Aldrich v. Boeing Co.,* 146 F.3d 1265, 1270 (10th Cir.1998) (sic), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999) (sic) ("An impairment need not be permanent in order to rise to the level of a disability"). The question is open in this circuit and we intimate no opinion on it.

*Id.* at 317.

Thus, it appears that even under the ADA, it is not completely clear that Plaintiff's condition could not constitute a disability as a matter of law.

### 2. Poppink Act

In addition, the Court must acknowledge that the FEHA explicitly differentiates its definition of disability from that of the ADA. On January 1, 2001, the Prudence Kay Poppink Act (the "Poppink Act") took effect. Via the Poppink Act, the definition of mental disability in California Government Code section 12926 was amended to read: "Mental disability" includes, but is not limited to, all of the following: "(1) Having any mental or psychological disorder or condition, such as . . . emotional or mental illness . . . that *limits* a major life activity." Cal Gov't Code § 12926(i)(1) (emphasis added). In turn, "[a] mental or psychological disorder or condition limits a major life activity if it makes the achievement of the major life activity *difficult.*" Cal. Gov't Code § 12926(i)(1)(B) (emphasis added). The FEHA states that " '[m]ajor life activities' shall be broadly construed and shall include physical, mental, and social activities and working." Cal. Gov't Code § 12926(i)(1)(C).

Defendant argues that because Plaintiff's condition, which lasted from approximately June 2001 to early January 2002, was only temporary, Plaintiff did not suffer from a disability cognizable under the FEHA. Defendant urges this Court to hold, as a matter of law, that a temporary disability cannot constitute a "disability" for purposes of the FEHA. Such a proposition effectively ignores the factual analysis required by Cal. Gov't Code § 12926, and is inconsistent with the definition of "mental disability" set forth in the FEHA.

The FEHA articulates five non-exclusive definitions of "mental disability:"

> (1) Having any mental or psychological disorder or condition, such as mental retardation, organic brain syndrome, emotional or mental illness, or specific learning disabilities, that limits a major life activity.

(2) Any other mental or psychological disorder or condition not described in paragraph (1) that requires special education or related services.

(3) Having a record or history of a mental or psychological disorder or condition described in paragraph (1) or (2), which is known to the employer or other entity covered by this part.

(4) Being regarded or treated by the employer or other entity covered by this part as having, *or having had,* any mental condition that makes achievement of a major life activity difficult.

(5) Being regarded or treated by the employer or other entity covered by this part as having, *or having had,* a mental or psychological disorder or condition that has no present disabling effect, but that may become a mental disability as described in paragraph (1) or (2).

Cal. Gov't Code § 12926(i) (emphasis added).

On its face, it appears as though a simple appeal to the text of the statute answers the question of whether, as a matter of law, a temporary disability could constitute a disability for purposes of the FEHA. Definitions (4) and (5) define a disabled person as one regarded as having, or *having had,* a mental condition or disorder that makes achievement of a major life activity difficult or that has no present disabling effect, but that may become a mental disability. Based on a simple reading of the statute,[7] it appears that the California Legislature did not categorically exclude temporary disabilities, as Defendant would have the Court conclude. To the contrary, the Legislature appears to have included temporary disabilities within its broad definitions of "disability."

The Poppink Act also includes legislative findings and declarations, codified in California Government Code section 12926.1. Section 12926.1 begins by stating that the FEHA "provides protections independent from those in the [ADA]" and "afford[s] additional protections" than the ADA. Cal. Gov't Code § 12926.1(a). Section 12926.1 then specifically addresses the FEHA's expansive definition of disability:

> The law of this state contains broad definitions of physical disability, mental disability, and medical condition. It is the intent of the Legislature that the definitions of physical disability and mental disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling.

Cal. Gov't Code § 12926.1(b).

After stating that "mental disabilities" under the FEHA "include but are not limited to, chronic or episodic conditions such as HIV/AIDS, hepatitis, epilepsy, seizure disorder, diabetes, clinical depression, bipolar disorder, multiple sclerosis, and heart disease," § 12926.1 distinguishes the FEHA's definition of "physical disability" and "mental disability" from the definition of "disability" in the ADA:

> [T]he legislature has determined that the definitions of "physical disability" and "mental disability" under the law of this state require a "limitation" upon a major life activity, but do not require, as

---

**7.** The California Supreme Court has stated that the primary task in construing a statute is to ascertain the intent of the Legislature. "We make this determination by looking to the words used in the statute and giving them their plain meaning. If there is no ambiguity in the language of the statute, then the Legislature is presumed to have meant what it said." *Villa De Las Palmas Homeowners Ass'n v. Terifaj,* 33 Cal.4th 73, 82, 14 Cal. Rptr.3d 67, 90 P.3d 1223 (2004).

does the [ADA], a "substantial limitation." That distinction is intended to result in broader coverage under the law of this state than under that federal act.[8] Cal Gov't Code § 12926.1(c).[9] Noticeably absent from the FEHA's definition of physical and mental disability and from its legislative findings about such definitions is language regarding the weight to be given to the duration of a condition in concluding whether a person is disabled due to such condition.

The discussion above provides guidance to the Court, but it does not resolve the issue of whether Plaintiff was mentally disabled. In fact, further questions are presented. In particular, the Court must consider how much broader the FEHA's "limitation" standard is than the ADA's "substantial limitation" standard, particularly with regard to a condition that is temporary or of a short duration. This question, in turn, necessitates an examination of when a condition makes a major life activity "difficult;" that is, the Court must determine the criteria by which to measure at what point an impairment impacts a person so as to make a major life activity difficult. Again, given the facts of this case, the Court's focus must be more heavily on how a condition's duration, as opposed to its severity, affects reaching this "difficulty" threshold.

### 3. Cases Applying the FEHA

■ As noted, the FEHA contains a broader disability standard than does the ADA. Not only does the statutory language of the FEHA make this clear, but, in addition, courts have repeatedly so stated. *See, e.g., Cripe v. City of San Jose,* 261 F.3d 877, 895 (9th Cir.2001); *Jensen v. Wells Fargo Bank,* 85 Cal.App.4th 245, 257–58, 102 Cal.Rptr.2d 55 (2000); *Bryan,* 307 F.Supp.2d at 1112; *Colmenares,* 29 Cal.4th at 1022–23, 130 Cal.Rptr.2d 662, 63 P.3d 220. Unfortunately, there is a dearth of caselaw exploring the contours of the

8. Prior to the Poppink Act, California courts were split as to whether a physical disability under the FEHA required only a limitation on a major life activity, not a "substantial" limitation. This split in authority among the California courts stemmed from an ambiguity created by the California Supreme Court in *Cassista v. Community Foods,* 5 Cal.4th 1050, 22 Cal.Rptr.2d 287, 856 P.2d 1143 (1993). In *Cassista,* the California Supreme Court referred to both a "substantially limiting" and a "limiting" standard in analyzing whether a condition sufficiently affected a major life activity. The Poppink Act specifically disclaims *Cassista* in § 12916.1(d): "Notwithstanding any interpretation of law in *Cassista v. Community Foods* (1993) 5 Cal.4th 1050, 22 Cal. Rptr.2d 287, 856 P.2d 1143, the Legislature intends (1) for state law to be independent of the [ADA], [and] (2) to require a 'limitation' rather than a 'substantial limitation' of a major life activity."

Subsequently, in *Colmenares,* the California Supreme Court "disapprove[d] the following cases to the extent they hold or suggest the federal law's *substantial limitation* test applies to claims of physical disability brought under the FEHA: *Diffey v. Riverside County Sheriff's Dept.* (2000) 84 Cal.App.4th 1031, 1039–1040, 101 Cal.Rptr.2d 353; *Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 629, 86 Cal.Rptr.2d 497; *Muller v. Automobile Club of So. California* (1998) 61 Cal. App.4th 431, 442, 71 Cal.Rptr.2d 573; *Pensinger v. Bowsmith, Inc.,* (1998) 60 Cal. App.4th 709, 721, 70 Cal.Rptr.2d 531; and *Gosvener v. Coastal Corp.* (1996) 51 Cal. App.4th 805, 813, 59 Cal.Rptr.2d 339." 29 Cal.4th 1019, 1031 n. 6, 130 Cal.Rptr.2d 662, 63 P.3d 220 (2003) (emphasis in original) (explanatory parenthetical phrases omitted).

9. Section 12926.1(c) also states: "[W]orking is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." Therefore, a plaintiff's inability to perform a specific type of position is a limitation on the major life activity of "working" as defined under the FEHA, notwithstanding that plaintiff's ability to perform other jobs. *See Bryan v. United Parcel Service,* 307 F.Supp.2d 1108, 1115 (N.D.Cal.2004).

FEHA's "limitation" standard for disability.[10] Moreover, most of the cases that do examine whether a plaintiff is disabled under the FEHA deal with whether various physical conditions qualify as physical disabilities. *See, e.g., Am. Nat'l Ins. Co. v. Fair Employment and Housing Comm'n*, 32 Cal.3d 603, 186 Cal.Rptr. 345, 651 P.2d 1151 (1982) (although high blood pressure did not currently impair employee's ability to work, the employee's condition brought him within coverage of the FEHA); *Deschene v. Pinole Point Steel Co.*, 76 Cal. App.4th 33, 90 Cal.Rptr.2d 15 (1999) (plaintiff was disabled under the FEHA on account of heart condition and diabetes); *Angell v. Peterson Tractor, Inc.*, 21 Cal. App.4th 981, 26 Cal.Rptr.2d 541 (1994), *abrogated on other grounds by City of Moorpark v. Superior Court*, 18 Cal.4th 1143, 77 Cal.Rptr.2d 445, 959 P.2d 752 (1998) (although the employee had a full release to return to work after his last heart attack and was fully able to perform his employment duties, his heart condition fell within coverage of the FEHA); *County of Fresno v. Fair Employment and Housing Comm'n*, 226 Cal.App.3d 1541, 1549–50, 277 Cal.Rptr. 557 (1991) (holding that hypersensitivity to tobacco smoke arising from respiratory disorders such as asthma and scarcoidosis is a covered disability under the FEHA); *Raytheon Co. v. Fair Employment & Housing Comm'n*, 212 Cal.App.3d 1242, 1252, 261 Cal.Rptr. 197 (1989) (holding that having AIDS or being HIV-positive was a physical disability under the FEHA even prior to the amendment expressly stating such). In turn, the cases uncovered by the Court that address physical conditions all analyze the question of "limitation" by looking to the severity of the condition; no case found by the Court deals with a temporary condition (as *Sanders* did with regard to the ADA).

The Court has found only one published case in which a court has offered a reasoned analysis of whether a plaintiff had a mental disability under the FEHA. In *Jensen*, the California Court of Appeal held that a bank manager who suffered from posttraumatic stress disorder after she was the victim of an attempted bank robbery was "mentally disabled" under the FEHA. 85 Cal.App.4th at 257–59, 102 Cal. Rptr.2d 55. On account of her condition, the plaintiff suffered from anxiety, nervousness, depression, lack of confidence, a helpless feeling, a feeling of humiliation, headaches, teeth grinding, nightmares, sleeplessness, and panic attacks and stated that she could not work at any job in a bank branch location or a job that involved working with the public or with cash. *Id.* at 254, 102 Cal.Rptr.2d 55. Notably, the plaintiff's opposition to the defendant's summary judgment motion was primarily supported by her own declaration, and there is no indication that a medical professional of any sort had treated and/or diagnosed the plaintiff.

After holding that the plaintiff need only show that her condition limited, rather than substantially limited, a major life activity, the *Jensen* court held that the plaintiff's condition could, as a matter of law, meet the definition of mental disability even under the "substantial limitation" standard. As such, *Jensen* supports Plaintiff's position to some degree in that it holds a self-diagnosed mental condition that interfered with the plaintiff's ability to work easily met the "limitation" standard.

---

**10.** The Court emphasizes that the relevant cases are only those that apply the "limitation" standard (as opposed to the "substantial limitation" standard) to FEHA claims. Indeed, as noted *supra* at n. 8, cases that applied the "substantial limitation" standard in determining whether a plaintiff was disabled under the FEHA have been overruled by the California Supreme Court in that respect.

However, the *Jensen* court did not discuss how long the plaintiff expected to suffer from posttraumatic stress disorder. From this Court's reading of the facts in *Jensen*, it does not seem that the plaintiff's condition was temporary, but, rather it appears that the plaintiff would continue to be adversely affected by the bank robbery for an extended period. Thus, while *Jensen* indicates that a defendant faces a difficult task in seeking a determination that, as a matter of law, a condition is not severe enough to be a mental disability, *Jensen* does not speak to the key issue of the weight to be given to a condition's temporary duration.

### 4. Legislative Intent

As a result of the dearth of published case law specifying how the duration of a plaintiff's condition should apply to a determination of whether the condition is a "disability" under the FEHA, the parties' arguments in response to the Court's Order for further briefing rely largely on the parties' interpretations of the legislative history of the Poppink Act.

Defendant asserts that the purpose of the Poppink Act was to provide that the definition of "limitation" under the FEHA was to be determined without regard to mitigating measures by employees, citing an April 10, 2000 letter from the Fair Employment and Housing Commission ("FEHC") to Assembly Member Sheila J. Kuehl, which states that "[the Poppink Act] would send a clear message that California law is not in accord with the recent trilogy of United States Supreme Court decisions in *Sutton v. United Air Lines*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *Murphy v. United Parcel Service* (1999) 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484, and *Albertson's Inc. v. Kirkingburg* (1999) 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 that found that, in determining whether a person has a disability under the ADA, consideration must

be given to such mitigating measures." (Letter from FEHC to Kuehl of 4/10/00 at 1.) Defendant argues that since these three opinions did not consider the extent to which temporary or minimal psychological conditions limit major life activities, the Legislature did not intend for the FEHA to deviate from the ADA on the issue of duration, which the federal regulations state should be taken into account in determining whether a plaintiff is disabled for purposes of the ADA. Although the clarification regarding mitigating measures was undoubtedly one purpose of the Poppink Act, the letter to Assembly Member Kuehl also states that the bill "would amend the Fair Employment and Housing Act to clarify that California state disability law is independent of and broader than the federal Americans with Disability Act of 1990(ADA)." (Letter from FEHC to Kuehl of 4/10/00 at 1.)

Defendant argues that since the Poppink Act expressly stated that it was parting ways with federal law on the issue of mitigating measures, the Legislature knew how to eliminate the effects of federal law when it so chose. Since the Poppink Act did not address the issue of the durational element of "disability," the argument runs, the Legislature must not have intended to break with the federal regulation's use of duration as a factor for determining whether a plaintiff is disabled. However, Plaintiff argues that the Legislature's failure to address the durational issue indicates that the Legislature did not intend for duration to be a factor in determining whether a plaintiff is disabled. Plaintiff reasons that since the Legislature had the federal model before it, which takes duration into account in determining whether an employee is *substantially* limited in a major life activity, the Legislature could have chosen to follow the federal model and include duration as a factor in determining whether an employee is *limited* in

a major life activity for purposes of the FEHA. Since the Legislature did not choose to include duration as a factor, and since the FEHA definition of "disability" is intended to be broader than the ADA definition, the Legislature did not intend for duration to be a factor in determining whether a plaintiff is disabled for purposes of the FEHA. Given that the California Supreme Court has held that the ADA's "substantial limitation" test does not apply to the FEHA, Plaintiff has the better of this argument, and Defendant has certainly not put forth sufficient evidence to establish that the Legislature intended to institute a durational *requirement* in establishing that a defendant is disabled under the FEHA.

In addition, Defendant asserts that the Poppink Act actually *added* a limitation to the requirements for a mental condition to be considered a "disability." In order to be considered a disability, a mental condition must "limit" participation in a major life activity. Prior to the Poppink Act, the FEHA did not contain this requirement. (State Personnel Board Enrolled Bill Report, AB 2222 at 3.) The State Personnel Board cited *Swenson v. County of Los Angeles,* 75 Cal.App.4th 889, 89 Cal. Rptr.2d 572 (1999), a case applying the old FEHA standard, for the proposition that application of the old standard "may very well lead to a finding that just about everyone in the work place is mentally disabled, as most employees experience some degree of stress, depression, etc." (State Personnel Board Enrolled Bill Report, AB 2222 at 3.) The State Personnel Board asserted that the Poppink Act would "clear up this ambiguity." However, it appears

that the addition of this requirement that the mental condition "limit" participation in a major life activity was intended simply to require that the same standard of "limitation" of a major life activity that applies to physical disabilities would apply to mental disabilities. The State Personnel Board did not state that *no* temporary mental conditions would constitute "disabilities" under the Poppink Act, and stressed the fact that the FEHA was intended to provide broader protection than the ADA. (State Personnel Board Enrolled Bill Report, AB 2222 at 4.) (pointing out that the FEHA requires that "the condition need only make achievement 'difficult,'" unlike the ADA, which requires that a condition "substantially limits" a major life activity). Ultimately, the State Personnel Board avoided taking a position on the precise limits of what types of conditions make major life activities "difficult," stating that "[t]he courts will ultimately have to determine just how much lower a standard the 'difficult' language creates, however, there is little doubt that the FEHA will provide coverage to significantly more individuals than it previously has." (State Personnel Board Enrolled Bill Report, AB 2222 at 4.) [11]

Defendant's argument boils down to an assertion that the Legislature could not possibly have intended for temporary ailments to constitute "disabilities" under the FEHA, because this would mean that every citizen in California who suffered from a cold, the flu, or the degree of stress or depression that most employees in the workplace experience would be "disabled" under the FEHA, and this would be "an absurd result." [12] However, the mere fact

---

11. The Court notes that the Legislature's failure to take a position regarding the severity required for a condition to constitute a "disability" under the FEHA puts the courts in the position of having to legislate. It is not the proper role of the Legislature to compel the courts to legislate.

12. It should be noted that a jury would still be required to make a determination of whether the employee's cold, flu, or stress limited the employee in a major life activity in order for the employee to be "disabled" for purposes of the FEHA.

that a statute is "absurd" does not preclude a finding that it is what the Legislature intended, especially since Defendant does not seem to have a textual foothold for the proposition that the Legislature intended to include a durational requirement in its definition of "disability." The Court declines to draw such a conclusion based on the Legislature's silence, especially in light of the Legislature's specific instructions in section 12926.1 that the FEHA definition of "disability" is to be construed more broadly than the definition of "disability" under the ADA.[13]

In addition, Plaintiff argues that the conditions listed in Defendant's parade of horribles might be so minor as to not constitute a limitation on a major life activity, but that Plaintiff's condition, consisting of an adjustment disorder with mixed anxiety and a depressed mood with psychological factors affecting his medical condition including aggravating headaches and gastrointestinal distress, did constitute a limitation on a major life activity by making working difficult. Plaintiff points to Dr. Bloch's statements that Plaintiff was "significantly depressed" and that the "degree of depression at present [was] such that it greatly limit[ed] this man's ability to engage in the goal directed activities that would be expected of any employee." (Decl. of Bloch at ¶¶ 3–4, 8). The Court finds that a reasonable jury could be persuaded to find that Plaintiff's condition constituted a limitation on a major life activity.

Thus, the Court cannot hold, as a matter of law, that Plaintiff cannot establish that he is "disabled" for purposes of FEHA, and the trier of fact will need to determine whether Plaintiff's condition, although temporary, constituted a disability.

C. Failure to Provide a Reasonable Accommodation for a Disability in Violation of Cal. Gov't Code § 12940(m)

1. The FEHA's Relationship to the ADA

Though the FEHA predates the Americans with Disabilities Act of 1990 (the "ADA"), the California Legislature significantly amended the FEHA in 1992, modeling it after the ADA. See Colmenares v. Braemar Country Club, Inc., 29 Cal.4th 1019, 1025, 130 Cal.Rptr.2d 662, 63 P.3d 220 (2003).[14] Accordingly, where "the particular provision in question in the FEHA is similar to the one in the ADA, the courts have looked to decisions and regulations interpreting the ADA to guide construction and application of the FEHA." Hastings v. Dep't of Corrections, 110 Cal. App.4th 963, 973, 2 Cal.Rptr.3d 329 (2003). Accord Allen v. Pac. Bell, 348 F.3d 1113, 1114 n. 1 (9th Cir.2003); Humphrey v. Mem'l Hosp. Ass'n, 239 F.3d 1128, 1133 n. 6 (9th Cir.2001); Finegan v. County of Los

---

13. In addition, it is notable that several commentators have predicted that under the Poppink Act, the FEHA's definition of "disability" would be interpreted extremely broadly by courts. See Sabine Schoenbach, Making the Most of Moorpark: Delineating Protections Against Discrimination for Injured Workers after the Prudence K. Poppink Act, 24 Berkeley J. Emp. & Lab. L. 429, 465–67 (2003) ("Perhaps, after the Poppink Act, the California Courts will reevaluate the statute's applicability to temporary disabilities. The FEHA's definition of disability does not include a temporal requirement, nor does the California Code

of Regulations provide any guidance on the issue"); Michael L. Murphy, Assembly Bill 2222: California Pushes and Breaks the Disability Law Envelope, Cath. U.L.Rev. 495, 537–44 (2002) (citing Michael Joe, Amendment Draws Line in Disability Law, The Recorder, Jan. 2, 2001, at 1) ("I wonder what is not going to be considered a disability").

14. For a detailed history of the FEHA's definitions of "physical handicap" and "physical disability," see Colmenares, 29 Cal.4th at 1024–28, 130 Cal.Rptr.2d 662, 63 P.3d 220.

# 1054

*Angeles,* 91 Cal.App.4th, 1, 7, 109 Cal. Rptr.2d 762 (2001). However, "in a number of instances FEHA's anti-discrimination provisions provide even greater protection to employees" than does the ADA. *Cripe,* 261 F.3d at 895; *see, e.g.,* Cal Gov't Code § 12926.1 (explicitly stating that the FEHA defines "disability" more broadly than does the ADA).

### 2. Section 12940(m) Generally

In turning to Plaintiff's causes of action, the Court first examines Plaintiff's FEHA claim for failure to accommodate in violation of California Government Code section 12940(m). The Court does so because this claim implicates many of the issues presented in Plaintiff's FEHA claim for discriminatory termination in violation of California Government Code section 12940(a) and Plaintiff's other claims.

> Section 12940(m) states in relevant part: It shall be an unlawful employment practice, unless based on a bona fide occupational qualification ... (m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision ... shall be construed to require an accommodation that is demonstrated by the employer ... to produce undue hardship to its operation.

Cal. Gov't Code § 12940(m).[15]

Section 12940(m) gives rise to a separate cause of action from the FEHA's employment discrimination provision Section 12940(a). "Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself." *Jensen,* 85 Cal.App.4th at 256, 102 Cal.Rptr.2d 55. *See also Perez v. Proctor & Gamble Mfg. Co.,* 161 F.Supp.2d 1110, 1119 (2001) (quoting *Jensen* ); *Bagatti v. Dep't of Rehabilitation,* 97 Cal.App.4th 344, 362, 118 Cal.Rptr.2d 443 ("Subdivision (m) ... defines a separate and distinct unfair employment practice independent of subdivision (a)").

In order to succeed on a FEHA claim for failure to accommodate, a plaintiff must show that he (1) has a disability of which the employer is aware, and (2) is a qualified individual. Cal. Gov't Code § 12940(m). *See Bryan,* 307 F.Supp.2d at 1111; *Perez,* 161 F.Supp.2d at 1119; *Jensen,* 85 Cal.App.4th at 256, 102 Cal.Rptr.2d 55.[16] Unlike for a claim for employment discrimination, a plaintiff need not establish that an adverse employment action was caused by the plaintiff's disability because, as stated, a FEHA claim for failure to accommodate is an independent cause of action. *See Perez,* 161 F.Supp.2d at 1119; *Bagatti,* 97 Cal.App.4th at 360–61, 118 Cal. Rptr.2d at 454–55; *Jensen,* 85 Cal.App.4th at 256, 102 Cal.Rptr.2d 55.

If a plaintiff has a known disability and is a qualified individual, an employer cannot prevail on summary judgment "unless it establishes through undisputed facts

---

**15.** Prior to January 1, 2000, Cal. Gov't Code 12940(k) contained this language.

**16.** *Bagatti* explicitly disagrees with *Jensen* in holding that § 12940(m) does not require that a reasonable accommodation for a disability be made only where the plaintiff is a "qualified individual." The *Bagatti* court assumes that *Jensen* imported the "qualified individual" requirement from the ADA. However, *Bagatti* fails to consider the opening statement of

§ 12940: "It shall be an unlawful employment practice [as enumerated in the following subdivisions], *unless based upon a bona fide occupational qualification. ...*" Thus, while subdivision (m) does not make reference to a plaintiff's occupational qualifications, the statute as a whole clearly institutes a requirement that a plaintiff be qualified. In this Court's view, *Jensen* correctly read the FEHA statute to require that a plaintiff be qualified.

that ... reasonable accommodation was offered and refused" or that it "did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Jensen,* 85 Cal.App.4th at 263, 102 Cal.Rptr.2d 55; *see also Perez,* 161 F.Supp.2d at 1122. Except in limited circumstances, an employee must initiate the interactive process. *See Brown v. Lucky Stores, Inc.,* 246 F.3d 1182, 1188 (9th Cir.2001).

As discussed above, a material issue of fact exists as to whether Plaintiff was disabled for purposes of FEHA. This means that, viewing the facts in the light most favorable to Plaintiff, the Court presumes that Plaintiff *was* disabled for purposes of Defendant's Motion for Summary Judgment.

3. *Whether Defendant Was Aware of Plaintiff's "Disability" Is a Question of Fact*

■ The Court first addresses the question of whether Defendant was on notice of the contents of Dr. Bloch's report by virtue of the fact that it had been submitted to two claims administrators (Schempp and Skelton)in Defendant's Risk Management Department. Because the agents that received Dr. Bloch's report were involved with administering Defendant's workers' compensation claims, the relevant inquiry here requires more than just ascertaining whether the knowledge of Dr. Bloch's report possessed by Defendant's agents can be imputed to Defendant. Indeed, Defendant argues that it did not have knowledge of Dr. Bloch's

report because its agents (Sedgwick, Brundo, Schempp, and Skelton) were not obligated to disclose Dr. Bloch's report or its contents to Defendant's non-Risk Management employees and, moreover, were precluded contractually and by California Labor Code section 3762, as it existed prior to January 1, 2003, from doing so.

California Labor Code section 3762 addresses disclosure of documents submitted in connection with workers' compensation claims. Prior to January 1, 2003, § 3762 stated, in relevant part:

(c) An insurer, third-party administrator retained by a self-insured employer pursuant to Section 3702.1 to administer the employer's workers' compensation claims, and those employees and agents specified by a self-insured employer to administer the employer's workers' compensation claims, *are prohibited* from disclosing or causing to be disclosed to an employer, any medical information, as defined in Section 56.05 of the Civil Code,[17] about an employee who has filed a workers' compensation claim, *except* as follows:

(2) *Medical information* regarding the injury for which workers' compensation is claimed *that is necessary for the employer to have in order for the employer to modify the employee's work duties.*

Cal. Labor Code § 3762(c)(2) (West 2002) (emphases added). This statute is applicable to the agents in question in that: (1) Sedgwick is a third-party administrator retained by a self-insured employer (Defendant) to administer Defendant's workers' compensation claims, and (2) Schempp

---

**17.** At the time of the events giving rise to this action, California Civil Code § 56.05(f) defined "medical information" in relevant part as: "[A]ny individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civil Code § 56.05(f) (2001).

and Skelton are employees specified by Defendant to administer Defendant's workers' compensation claims.[18]

Because neither Schempp nor Skelton disclosed information from Dr. Bloch's report to anyone at Federal Express, Defendant would be deemed to have notice of the contents of the Bloch report only if: (1) Cal. Labor Code § 3762(c) did not prohibit Schempp and Skelton from disclosing Dr. Bloch's recommendation to Defendant (i.e., Dr. Bloch's recommendation was necessary for Defendant to have in order for Defendant to modify Plaintiff's work duties); *and* (2) principles of agency law dictate that, even though Plaintiff had not requested a modification of his work duties, Schempp's and Skelton's knowledge of Dr. Bloch's recommendation is imputed to Defendant, or that Schempp and Skelton should have passed on the relevant information. In other words, medical information from Dr. Bloch's report would only be imputed to Defendant if, under the circumstances, § 3762(c)(2) permitted disclosure of such information and, in turn, if principles of agency law imposed a duty on Schempp and Skelton to disclose such information.[19]

### a. Cal. Labor Code § 3762(c)(2) Permitted Disclosure of the Contents of Dr. Bloch's Report

With regard to whether § 3762(c) prohibited Schempp and Skelton from communicating the contents of Dr. Bloch's report—that is, whether Dr. Bloch's report contained medical information that would be necessary for Defendant to have in order to modify Plaintiff's work duties—the Court notes that neither it nor the parties have found on-point precedent.[20] The case that presents the most similar context is *Rowe v. City & County of San Francisco*, 186 F.Supp.2d 1047 (N.D.Cal. 2002). In *Rowe*, the plaintiff was off work for seven months after injuring her back. Upon returning to work, the plaintiff requested a job transfer as a reasonable accommodation. In addition to sending a

---

18. The contractual restrictions to which Defendant cites arise from an Addendum entered into between Defendant and Sedgwick on May 11, 2000 (effective as of January 15, 1998). According to Defendant, the Addendum, which lists sixteen Federal Express employees authorized to receive medical information from Sedgwick concerning a workers' compensation claim, was motivated by Cal. Labor Code § 3762. In relevant part, the Addendum states: "Employer [Defendant] acknowledges the provisions of the Labor Code Section 3762 and agrees that Employer, and its employees and agents, shall *abide by its provisions....*" (Addendum at ¶ 1). This contract does not create any additional duties or restrictions beyond those established in § 3762. The contract's relevancy is only that it demonstrates that Defendant and Sedgwick understood that § 3762 applied to their arrangement and that certain employees of Defendant (including Schempp and Skelton) were designated to administer Defendant's workers' compensation claims in conjunction with Sedgwick.

19. The Court emphasizes that § 3762(c)(2) does not impose a duty upon employees such as Schempp and Skelton. Rather, § 3762(c) merely *allows* the disclosure of necessary medical information.

20. Indeed, this statute has seldom been cited in published caselaw. While Plaintiff cites to *Rowe v. City of San Francisco*, discussed herein at 41–42, Defendant cites to *Tannlund–McCoy v. Golden Gate Bridge*, 2003 WL 21838378 (N.D.Cal. July 30, 2003). The Court finds *Tannlund–McCoy* to be inapposite. In *Tannlund–McCoy*, the district court merely stated the obvious: the defendant employer could not access the complete medical reports submitted in connection with the plaintiff's workers' compensation case unless the plaintiff released such reports to the defendant. 2003 WL 21838378 at *9. In its cursory reference to § 3762(c)(2), *Tannlund–McCoy* does not delve into the questions of when, under § 3762(c)(2), it is necessary for an employer to have medical information so that it may modify an employee's work duties and what kind of information that would be.

medical report to the defendant, the plaintiff's doctor submitted medical reports in connection with the plaintiff's workers' compensation claim to the defendant's workers' compensation claim adjuster and the plaintiff's workers' compensation lawyer. The defendant argued that it could not legally review its workers' compensation medical file to determine if the plaintiff was disabled, but the court, citing § 3762(c)(2), stated that an employer "surely has the ability to review an employee's record for more information concerning the employee's medical condition in determining whether she possesses a disability and requires an accommodation." 186 F.Supp.2d at 1054 n. 8.

*Rowe* is factually distinct from the instant case because in *Rowe* the plaintiff indisputably triggered the interactive process by requesting an accommodation, whereas here, Plaintiff never requested an accommodation himself. Indeed, the only means by which Plaintiff may have triggered the interactive process would be through Dr. Bloch's report.[21] Nevertheless, the Court believes this factual distinction to be of little consequence and finds *Rowe* to be persuasive. The effect of Plaintiff's failure to ask for an accommodation by a means other than that possessed by the workers' compensation claims administrators (i.e. Dr. Bloch's report), is not relevant to determining whether Dr. Bloch's report contained medical information that would be necessary for Defendant to have in order to modify Plaintiff's work duties; rather, Plaintiff's failure to otherwise request an accommodation is relevant in determining whether Schempp and Skelton should have conveyed the pertinent parts of Dr. Bloch's report to Defendant's management.

Accordingly, at this point, the analysis can be stated rather simply: Plaintiff had filed a workers' compensation claim based on depression. Schempp and Skelton, as Defendant's workers' compensation claims administrators, were authorized by § 3762(c)(2) to disclose to Defendant any medical information (i.e. information regarding Plaintiff's medical history, mental or physical condition, or treatment) regarding Plaintiff's depression that would be necessary for Defendant to have in order to modify Plaintiff's work duties.[22] Thus, the first question to be resolved is whether Dr. Bloch's report contains such information. If it does not, then there would be nothing in the report that Schempp and Skelton legally could have disclosed to Defendant. If it does contain such information, however, Schempp and Skelton could have disclosed relevant portions of the report and, in turn, a further question is presented: *should* Schempp and Skelton have disclosed the relevant portions of Dr. Bloch's report to Defendant's management.

Whether Dr. Bloch's report contained necessary medical information is a question of fact. As such, it cannot be resolved by the Court. However, as the Court must view the facts in the light most favorable to Plaintiff at this stage, the Court, for purposes of this Motion, finds that Dr. Bloch's report contains medical information about Plaintiff's psychological condition that would have been necessary for Defendant to modify Plaintiff's work duties.

---

**21.** As discussed *infra* at 1061–62, an employee adequately initiates the interactive process when an agent of the employee, such as the employee's doctor, requests an accommodation.

**22.** This point is conceded by Dale Springfield, a manager in Defendant's workers' compensation department. *See supra* at 1043.

#### b. Schempp's and Skelton's Duty to Disclose Medical Information

■ Having found for purposes of this Motion that Schempp and Skelton were permitted to disclose medical information found in Dr. Bloch's report that was necessary for Defendant to have in order to modify Plaintiff's work duties, the Court must now look to whether Schempp and Skelton had a duty to pass along such information to Defendant. Principles of agency law control this inquiry for the reasons set forth below.

The California Supreme Court has stated that "an employee is an agent" of his employer and, as such, is bound by the relevant principles of agency law. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 699, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) (internal quotation omitted). *Cf. Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 879 (9th Cir.1989) (holding that under Washington law, "traditional agency principles are fully applicable in the employment context"). Indeed, in the context of an employee's lawsuit against her employer for sexual harassment in violation of FEHA, a California court stated that "[i]t is by now familiar law, that like Title VII, the FEHA should ... be construed in light of established principles of agency." *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App.4th 994, 1007, 112 Cal.Rptr.2d 347 (2001). Therefore, agency principles must be applied in determining whether Schempp's and Skelton's knowledge of the contents of Dr. Bloch's report can be imputed to Defendant.

California Civil Code section 2332, entitled "Notice to principal or agent as notice to the other," states: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." This rule "is based on the theory that the agent will disclose to the principal that which it is obligated to disclose." *Gregg v. Cloney*, 91 Cal.App.4th 429, 439 n. 10, 110 Cal.Rptr.2d 615 (2001) (citation omitted). Furthermore, "[t]he scope of the imputation of knowledge is directly related to the scope of the duty arising from the agency agreement; it has nothing to do with whether the agent actually has the information in question or has it only constructively." *Triple A Mgmt. Co. v. Frisone*, 69 Cal. App.4th 520, 535, 81 Cal.Rptr.2d 669 (1999).

Thus, whether knowledge possessed by an agent is imputed to the principal is a contextual inquiry. Not only must the agent possess the information in question, but the agent must possess information that, given the agent's position and other relevant circumstances, should "in good faith and [in] the exercise of ordinary care and diligence" be passed along to the principal.

■ It is at this point that the Court must address Defendant's array of arguments as to why Schempp and Skelton were prohibited from disclosing any of the contents of Dr. Bloch's report to Defendant's non-risk management employees. However, in turning to these arguments, the Court notes that Defendant has misdirected its focus. For instance, Defendant has argued that Dr. Bloch's report does not contain any medical information about Plaintiff's psychological condition that would have been necessary for Defendant to modify Plaintiff's duties because Plaintiff did not otherwise make a request for accommodation. As the Court has pointed out, whether Plaintiff made such a request has nothing to do with whether Dr. Bloch's report contained such information. Rather, Plaintiff's failure to otherwise request accommodation is relevant to whether Schempp and Skelton "in good faith and [in] the exercise of ordinary care and diligence" ought to have communicated the

pertinent contents of Dr. Bloch's report to Defendant. The same can said for Defendant's argument that Schempp and Skelton were prohibited from disclosing the contents of Dr. Bloch's report because Plaintiff's workers' compensation claim had not been found compensable at the time. The lack of a finding of compensability is relevant to the question of whether Schempp and Skelton "in good faith and [in] the exercise of ordinary care and diligence" should have disclosed portions of Dr. Bloch's report to Defendant, not to the question of whether Dr. Bloch's report contained necessary medical information.

Accordingly, further questions of fact are presented. While it is undisputed that Schempp and Skelton had notice of the contents of Dr. Bloch's report, there are material questions of fact as to whether "in good faith and [in] the exercise of ordinary care," Schempp and Skelton ought to have disclosed certain portions of Dr. Bloch's report to Defendant and, if so, which portions of Dr. Bloch's report should have been disclosed. *See* California Forms of Jury Instruction, MB 300C.59[1] (2004) ("A principal is considered to have notice of whatever the agent has notice of and ought, in good faith and the exercise of ordinary care, to communicate to the principal"). A trier of fact will have to determine whether good faith requires a person in Schempp's and Skelton's position to disclose medical information pertaining to a doctor's job modification request when the patient has not made such a request. Similarly, it must be left to a trier of fact to

determine whether Schempp and Skelton, in the exercise of ordinary care, should have communicated pertinent information about Plaintiff's condition even though Plaintiff's workers' compensation claim had not been found compensable.

Whether Schempp and Skelton ought to have communicated portions of Dr. Bloch's report to Defendant is a question for the trier of fact. Because the Court must view the facts in the light most favorable to Plaintiff, the Court presumes for purposes of this Motion that Schempp and Skelton ought to have communicated portions of Dr. Bloch's report to Defendant's management, and, therefore, knowledge of those portions of Dr. Bloch's report is imputed to Defendant. Specifically, the Court presumes for purposes of this motion that Schempp and Skelton should have disclosed the portions of Dr. Bloch's report pertaining to Dr. Bloch's analysis of Plaintiff's medical condition and Dr. Bloch's recommendation that Plaintiff's work duties be modified.

### 4. Whether Plaintiff Is a Qualified Individual Is a Question of Fact

 Under the ADA, a disabled individual must establish that he is "qualified" for the job in question. *See* 42 U.S.C. § 12112(a). The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the functions of the employment position that such individual holds or desires." [23] 42

**23.** This language tracks the definition of "qualified individual with handicap" under the Rehabilitation Act of 1973. *See* 29 C.F.R. § 1614.203(a)(6) (defining "qualified individual with handicap" as "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others"). Because the ADA expressly requires its provisions to be interpreted in a way that "prevents imposition of inconsistent or conflicting standards for the same requirements" under two statutes, 42 U.S.C. § 12117(b) and because the Ninth Circuit considers Rehabilitation Act cases to be instructive in analyzing ADA claims, the Court relies on case law interpreting the Rehabilitation Act's "qualified" requirement in analyzing analogous requirement of the ADA and, in turn, the FEHA.

U.S.C. § 12111(8). When an employee is seeking reassignment of his position as an accommodation, he is a "qualified individual" if he can "perform the essential functions of [the] reassignment position, with or without reasonable accommodation, even if [he] cannot perform the essential functions of the current position". *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1111 (9th Cir.2000). *Accord Smith v. Midland Brake Inc.,* 180 F.3d 1154, 1161–62 (10th Cir.1999); *Feliciano v. Rhode Island,* 160 F.3d 780, 785–86 (1st Cir.1998); *Gaul v. Lucent Techs., Inc.,* 134 F.3d 576, 578–80 (3d Cir.1998).

■ While unlike the ADA, the FEHA does not use the term "qualified individual," it does provide that an employer need not accommodate the disability of an employee if its reason for not doing so is "based upon a bona fide occupational qualification." Cal Gov't Code § 12940. Numerous courts have thus held that a plaintiff seeking relief under § 12940, like a plaintiff seeking similar relief under the ADA, must be able to perform the essential functions of the position at issue with or without reasonable accommodation.[24] *See, e.g., Ford v. Tosco Refining Co.,* 2001 WL 1006813 at *5 (N.D.Cal. Aug.16, 2001); *Pensinger v. Bowsmith, Inc.,* 60 Cal. App.4th 709, 719, 70 Cal.Rptr.2d 531 (1998), *overruled on other grounds by Colmenares,* 29 Cal.4th at 1031 n. 6, 130 Cal.Rptr.2d 662, 63 P.3d 220. Furthermore, as under the ADA, where an employee is seeking accommodation through reassignment within an organization, "the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position." *Jensen,* 85 Cal.App.4th at 256, 102 Cal.Rptr.2d 55. *Accord Perez,* 161 F.Supp.2d at 1121.

Defendant argues that Plaintiff is not a qualified individual because he was excessively absent from work and a CSA's regular attendance of his scheduled shifts is an essential function of that employee's job. According to Defendant, a CSA's unscheduled absence leads to hardship for Defendant in that replacement CSA's often are unavailable, forcing management to replace the absent CSA with a non-CSA, such as a courier, who may not be familiar with CSA duties. In turn, this unfamiliarity may cause packages to be delivered to the wrong location, thereby undermining the ability of Defendant to provide reliable, time-certain delivery of goods and documents.

Numerous courts have held that attendance at work is an essential job function. *See, e.g., Nesser v. Trans World Airlines, Inc.,* 160 F.3d 442, 445 (8th Cir.1998) (Plaintiff did not establish that he could perform essential functions of his job without accommodation because he was unable to attend work on a regular basis); *Carr v. Reno,* 23 F.3d 525, 530 (D.C.Cir.1994) (coming to work regularly was an "essential function"); *Tyndall v. Nat'l Educ. Centers, Inc.,* 31 F.3d 209, 213 (4th Cir. 1994) ("[A] regular and reliable level of attendance is a necessary element of most jobs"). Therefore, if Plaintiff would still have attendance problems on account of his depression upon being reassigned, then Defendant could make a compelling case that Plaintiff was not qualified.

---

**24.** Under the FEHA, "reasonable accommodations" include "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." Cal. Gov't Code § 12926(n)(2).

Plaintiff states that his depression stemmed from abusive treatment he received at the hands of his supervisors. His depression, in turn, caused him to miss nine and a half days of work in December 2001, after which Plaintiff was terminated. Plaintiff's position, endorsed by Dr. Bloch, is that reassignment to a CSA position in which Aubrey and Vint were not his supervisors would alleviate his depression and, therefore, ensure his attendant at work.

The Court cannot speculate and conclusively hold that Plaintiff's attendance deficiencies would be ameliorated if he was working in the same position under different supervisors-this is a question for the trier of fact. However, the Court does find that, viewing the facts and the inferences arising therefrom in the light most favorable to Plaintiff, Plaintiff is a qualified individual.

### 5. Defendant's Failure to Engage in the Interactive Process and Make Reasonable Accommodation

█ It is undisputed that Defendant did not offer to modify Plaintiff's work duties. Therefore, because the Court has found for purposes of this motion that Plaintiff had a known disability and Plaintiff could do his job if reassigned, Defendant is not entitled to summary judgment unless it "did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Jensen,* 85 Cal. App.4th at 263, 102 Cal.Rptr.2d 55.

Because specific requirements of the interactive process under FEHA are not set forth in the statute and have not been detailed by California courts, courts look to ADA caselaw in evaluating the sufficiency of a given case's interactive process. *See, e.g., Tannlund–McCoy,* 2003 WL 21838378, at *8; *Jensen,* 85 Cal.App.4th at 263, 102 Cal.Rptr.2d 55. In *Barnett,* the Ninth Circuit rejected the defendant-employer's argument that the plaintiff-employee had the burden of demonstrating the availability of a reasonable accommodation. Rather, the *Barnett* court held that the plaintiff and defendant shared the burden and explained the rationale for the interactive process requirement:

> To put the entire burden for finding a reasonable accommodation on the disabled employee or, effectively, to exempt the employer from the process of identifying reasonable accommodations, conflicts with the goals of the ADA.... Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has.

*Barnett,* 228 F.3d at 1113.

While the employee does not bear the entire burden of demonstrating the availability of a reasonable accommodation, the employee must engage in the interactive process in good faith. Indeed, the employer's duty to engage in the interactive process generally "is triggered by an employee *or an employee's representative* giving notice of the employee's disability and the desire for an accommodation." *Barnett,* 228 F.3d at 1112 (emphasis added). There are circumstances in which an employer is bound to engage in the interactive process even if an employee (or his representative) has not requested accommodation, *see Barnett,* 228 F.3d at 1112; *Brown,* 246 F.3d at 1188, but Plaintiff need not prove such circumstances existed because Dr. Bloch, through his report, put Defendant on notice of Plaintiff's need for an accommodation.

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir.2001). An employer "who fail[s] to engage in the interactive process in good faith, face[s] liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Barnett*, 228 F.3d at 1116.

The Court has found for purposes of summary judgment that knowledge of Dr. Bloch's report is imputed to Defendant. In recommending that Plaintiff should be transferred away from Aubrey and Vint, Dr. Bloch put Defendant on notice of Plaintiff's desire for an accommodation. Therefore, Defendant was obligated to engage in the interactive process. Because Defendant failed to engage in the interactive process, Defendant is in violation of § 12940 if it could have reasonably accommodated Plaintiff.[25] Whether Defendant, a large corporation that employs many CSA's (as conceded by Defendant's counsel in oral argument), could have made a reasonable accommodation for Plaintiff is a material issue of fact that must be reserved for trial.

In sum, because material issues of fact exist with respect to whether Plaintiff had a disability for purposes of the FEHA, whether Plaintiff's disability was known to Defendant, whether Plaintiff could have performed the essential duties of his job if reassigned, and whether Defendant could have made a reasonable accommodation for Plaintiff, Defendant's Motion for Summary Judgment must be DENIED with respect to Plaintiff's claim of failure to provide a reasonable accommodation for a disability in violation of Cal. Gov't Code § 12940(m).

### D. Disability Discrimination in Violation of Cal. Gov't Code § 12940(a)

#### 1. FEHA Framework

The California Fair Employment and Housing Act (the "FEHA") prohibits an employer from discriminating against an employee based on the employees's physical condition or disability. The FEHA states:

> It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification ... [f]or an employer, because of ... physical disability, mental disability, [or] medical condition ... of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, *or to bar or to discharge the person from employment* or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

Cal. Gov't Code § 12940(a) (emphasis added).

In that the FEHA is modeled after federal antidiscrimination law, the Americans with Disabilities Act of 1990 (the "ADA") in particular, "courts have looked to decisions and regulations interpreting the ADA to guide construction and application of the FEHA." *Hastings*, 110 Cal.App.4th at 973, 2 Cal.Rptr.3d 329. *Accord Allen*, 348 F.3d at 1114 n. 1; *Humphrey*, 239 F.3d at 1133 n. 6; *Finegan*, 91 Cal.App.4th at 7, 109 Cal.Rptr.2d 762. Thus, "[a]s with actions under federal antidiscrimination legislation, a plaintiff alleging discrimina-

---

**25.** Again, the Court is proceeding under the assumption that Plaintiff had a disability known to Defendant and that Plaintiff could have performed the essential duties of his job if reassigned.

ry termination under California's antidiscrimination scheme must be able to survive the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Horn v. Cushman,* 72 Cal.App.4th 798, 805–06, 85 Cal.Rptr.2d 459 (1999). *Accord Heard v. Lockheed Missiles & Space Co.,* 44 Cal. App.4th 1735, 1749–50, 52 Cal.Rptr.2d 620 (1996).

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the guidelines for a Title VII claim. First, a plaintiff must satisfy the burden of production by showing a prima facie case of discrimination by a preponderance of the evidence. Second, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment decisions. Third, if the defendant carries this burden, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reasons were merely pretext. *See Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp.,* 411 U.S. at 802–03, 807, 93 S.Ct. 1817; *Heard,* 44 Cal.App.4th at 1749–50, 52 Cal.Rptr.2d 620. "Although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination remains at all times with the plaintiff." *Heard,* 44 Cal.App.4th at 1750, 52 Cal. Rptr.2d 620 (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

■ According to *McDonnell Douglas,* in order to establish a prima facie case of discrimination, a plaintiff must establish (1) that she belongs to a protected class, (2) that she applied and was qualified for a job opening, (3) that she was rejected, despite her qualifications, and (4) that, af-

ter her rejection, the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253–54 n. 6, 101 S.Ct. 1089; *Heard,* 44 Cal.App.4th at 1750, 52 Cal.Rptr.2d 620.

Because the present case does not involve an actual hiring decision, but rather, a decision to terminate based on an alleged mental disability, the *McDonnell Douglas* factors are adjusted. *See Burdine,* 450 U.S. at 254, 101 S.Ct. 1089 ("[The *McDonnell Douglas* ] standard is not inflexible, as '[the] facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations' ") (quoting *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). Accordingly, in order to establish a prima facie case of discrimination under the FEHA, a plaintiff must show (1) he suffered from a disability, (2) he was otherwise qualified to do his job, and (3) he was subjected to adverse employment action because of his disability. *Finegan,* 91 Cal.App.4th at 7, 109 Cal.Rptr.2d 762. *See also Deschene v. Pinole Point Steel Co.,* 76 Cal.App.4th 33, 44, 90 Cal.Rptr.2d 15 (1999); *Brundage v. Hahn,* 57 Cal.App.4th 228, 235, 66 Cal. Rptr.2d 830 (1997).

If, after the plaintiff establishes a prima facie case for discrimination, the defendant provides a legitimate, non-discriminatory reason for its actions, the plaintiff must ultimately put forth sufficient evidence upon which a fact finder could reasonably conclude that the defendant's proffered reasons were pretextual, and that the most probable actual motive was unlawful discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

While the plaintiff does not have to show direct evidence of pretext, the plaintiff cannot merely make conclusory statements that the defendant's decisions were motivated by unlawful discrimination. *See Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir.1995), *cert. denied*, 516 U.S. 1048, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996); *Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir.1997) ("[C]onclusory allegations without factual support are insufficient to defeat summary judgment"). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742.

The plaintiff must produce specific, substantial evidence of pretext. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir.1996) ("[A] employee's subjective personal judgment of her competence alone does not raise a genuine issue of material fact"); *see also Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir.2002) ("[The plaintiff's] own statement that he was performing at a level equal to that of other employees is not enough to raise a genuine issue of material fact").

### 2. Plaintiff's Prima Facie Case

■ Defendant argues that Plaintiff cannot establish a prima facie case of disability discrimination under the FEHA because Plaintiff is not disabled, Plaintiff is not qualified to work as a CSA, and, even if Plaintiff does have a disability and is qualified to work as a CSA, Plaintiff was not subject to an adverse employment action because of such disability. Each of these contentions is examined below.

#### a. Plaintiff's Disability

As discussed *supra* at 19–34, Plaintiff has presented sufficient evidence to raise a triable issue of fact whether Plaintiff's con-dition constituted a "disability" for purposes of the FEHA. As such, Defendant is not entitled to summary judgment on the ground that Plaintiff was not "disabled" during the relevant period.

#### b. Plaintiff as Qualified to Do His Job

Similarly, as discussed *supra* at 47–49, Plaintiff has presented sufficient evidence to raise a triable issue of fact regarding whether Plaintiff was "qualified" to do his job as a CSA. As such, Defendant is not entitled to summary judgment on the ground that Plaintiff was not "qualified" to do his job.

#### c. Adverse Employment Action Because of Disability

Plaintiff has presented sufficient evidence to raise a triable issue of fact regarding whether he was subject to an adverse employment action, namely termination, because of a disability. Defendant's argument, that Plaintiff was fired because of his absences and not because of his disability, is circular. Although Defendant may have fired Plaintiff because of his absences, Plaintiff alleges that his absences were caused by his mental condition. Thus, if the trier of fact finds that Plaintiff's condition constituted a disability for purposes of the FEHA, and if the trier of fact believes that Plaintiff's absences were caused by that disability, Plaintiff will have established that Defendant's termination of Plaintiff was an adverse employment action taken because of Plaintiff's disability.

### 3. Defendant's Burden to Provide a Legitimate, NonDiscriminatory Reason for Plaintiff's Termination

■ Defendant asserts as its legitimate, non-discriminatory reason for terminating Plaintiff that Plaintiff was absent more often than company policy allowed.

However, as above, this argument is circular, because if the trier of fact finds that Plaintiff's condition constituted a disability for purposes of the FEHA, Defendant will be in the position of attempting to argue that terminating Plaintiff on the basis of absences that occurred as a result of Plaintiff's disability constitutes a legitimate, non-discriminatory reason for terminating Plaintiff. Such an argument would fail. As such, if the trier of fact finds that Plaintiff was disabled for purposes of FEHA, Defendant's firing of Plaintiff on the basis of absences incurred as a result of that disability would not constitute a legitimate, non-discriminatory reason for terminating Plaintiff, and Plaintiff would be able to establish disability discrimination on the basis of Plaintiff's prima facie case. As such, Defendant is not entitled to summary judgment on Plaintiff's disability discrimination cause of action.

### E. Wrongful Termination in Violation of Public Policy

"The tort cause of action for wrongful termination in violation of public policy provides a vehicle for recourse that otherwise would be unavailable under general rules of the at-will employment doctrine." *Phillips v. St. Mary Regional Medical Center,* 96 Cal.App.4th 218, 225, 116 Cal. Rptr.2d 770 (2002). "[T]his public policy exception allows an employee to bring a tort cause of action against an employer who terminates an at-will employment on a ground that violates fundamental public policy." *Id.* at 226, 116 Cal.Rptr.2d 770. "FEHA's provisions prohibiting discrimination may provide the policy basis for a claim for wrongful discharge in violation of public policy." *Id.* at 227, 116 Cal.Rptr.2d 770 (citing *Stevenson v. Superior Court,* 16 Cal.4th 880, 909, 66 Cal.Rptr.2d 888, 941 P.2d 1157 (1997) (holding that FEHA's prohibition of age discrimination could provide the basis for former employee's wrongful termination claim)).

Defendant's argument that it is entitled to summary judgment on Plaintiff's cause of action for wrongful termination in violation of public policy is that because Defendant did not violate the disability discrimination provisions of the FEHA, Defendant cannot, as a matter of law, be liable for wrongful termination in violation of public policy. However, Defendant cannot show, as a matter of law, that it did not discriminate against Plaintiff on the basis of his disability, as discussed *supra* at 1062–65. Because Plaintiff's ability to recover for wrongful termination in violation of public policy appears to rest on Plaintiff's ability to establish disability discrimination in violation of California Government Code § 12940(a), and because material issues of fact remain with regard to Plaintiff's disability discrimination claim, Defendant's Motion for Summary Judgment is DENIED with respect to Plaintiff's wrongful termination claim.

### F. Breach of Contract

Plaintiff's cause of action for breach of contract is based upon Defendant's employee manual's statement of Defendant's policy of providing reasonable accommodation in the employment of disabled employees. (Jardini Decl., Exh. 281 at 129–30). Although an employee is an at-will employee, "an allegation of breach of [a term of a written personnel manual or policy] implying limitations on an employer's power to discharge at will may be sufficient to state a cause of action for breach of an employment contract." *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 681–82, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) (citations omitted).

Defendant contends that it is entitled to summary judgment as to this cause of action because "Defendant complied with its obligations under the FEHA. There-

1066

fore, even assuming Defendant did not consider those obligations during the GFTP, Plaintiff was not damaged, because consideration of Defendant's obligations under the FEHA would not have changed the outcome of Plaintiff's appeal." (Def. Motion for Summary Judgment at 17). Again, Defendant rests on its allegation that Plaintiff was not disabled as a matter of law. However, because the Court has found that Defendant cannot show as a matter of law that Plaintiff's condition did not constitute a "disability" for purposes of the FEHA, and because Defendant's Motion for Summary Judgment rests on its claim that Plaintiff was not disabled, Defendant's Motion for Summary Judgment must similarly be DENIED with respect to Plaintiff's breach of contract claim.

### G. Breach of the Implied Covenant of Good Faith and Fair Dealing

■ " 'Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement.' " *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371, 1393, 272 Cal.Rptr. 387 (1990). However, if the allegations in a claim for breach of the implied covenant of good faith and fair dealing "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Id.* at 1395, 272 Cal.Rptr. 387.

■ In this case, Plaintiff's complaint states that both its cause of action for breach of contract and its cause of action for breach of the implied covenant of good faith and fair dealing are based on Plaintiff's allegation that Defendant's Guaranteed Fair Treatment Procedure was not applied in compliance with Defendant's contractual obligations in his case, since

Defendant failed to consider its obligations not to discriminate against Plaintiff on the basis of his alleged disability. (Complaint at 9–10). The only addition in Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is that Plaintiff attempts to recover punitive damages.

However, although "tort recovery for breach of the covenant is available ... in limited circumstances, generally involving a special relationship between the contracting parties, such as the relationship between an insured and its insurer," the employer-employee relationship does not constitute this special relationship. *See Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal.App.4th 1358, 1370, 83 Cal.Rptr.2d 388 (1999); *Careau & Co.*, 222 Cal.App.3d at 1396, 272 Cal.Rptr. 387 (stating that allowing tort recovery for breach of the implied covenant of good faith and fair dealing in the context of employment would be "a significant change in the law").

Because Plaintiff cannot recover punitive damages on the basis of his claim for breach of the implied covenant of good faith and fair dealing, his remaining claims are "simply duplicative [of his breach of contract cause of action], and thus may be disregarded." *See Careau & Co.*, 222 Cal. App.3d at 1392, 272 Cal.Rptr. 387. Thus, Defendant's Motion for Summary Judgment is GRANTED with respect to Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing.

### H. Deceit

■ California Civil Code § 1709 provides damages for "fraudulent deceit," stating that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." " 'The elements of fraud, which give rise to the tort cause of action for deceit, are (a)

misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *Maddux v. Philadelphia Life Ins. Co.*, 77 F.Supp.2d 1123, 1131 (S.D.Cal.1999) (citing *Lazar v. Superior Court*, 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996); *Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951, 973, 64 Cal. Rptr.2d 843, 938 P.2d 903 (1997)). "All of these elements must be present for actionable fraud to be found, and one missing element is fatal to recovery." *Id.* at 1131–32 (citing *Okun v. Morton*, 203 Cal.App.3d 805, 828, 250 Cal.Rptr. 220 (1988)).

■ Plaintiff alleges that Defendant's promise not to discriminate against disabled individuals, to provide reasonable accommodations to such individuals, and to provide a fair appeals process, contained within Defendant's employment manual, were promises made by Defendant with no intention of performing them. Arguably, Plaintiff has presented evidence that Defendant's promises were false, and that Defendant knew they were false, because Plaintiff has presented deposition testimony from Defendant's HR representative to the effect that all absences are counted against employees for purposes of discipline and termination, even if the absences result from a disability. (Jardini Decl., Exh. 276 at 35). However, Plaintiff has presented no evidence to allow the trier of fact to find that he justifiably relied on the alleged misrepresentations in changing his position. *See, e.g., Lazar*, 12 Cal.4th at 639, 49 Cal.Rptr.2d 377, 909 P.2d 981. For example, in *Lazar*, the plaintiff was able to survive the defendant's demurrer where the plaintiff alleged that he relied on the defendant's representations "in leaving secure New York employment, severing his connections with the New York employment market, uprooting his family, pur-

chasing a California home and moving here." *Id.*

By contrast, Plaintiff in this case has not even alleged that he would not have accepted employment with Defendant if not for Defendant's alleged misrepresentations in the employment manual. Plaintiff's only allegation regarding reliance is that he relied on Defendant's representations by "not pursu[ing] other avenues of relief, including a lawsuit, expecting that defendant Fed Ex would, in fact, proceed in good faith with regard to the appeal process regarding the potential termination of employment of plaintiff." (Complaint at ¶ 64). However, Plaintiff goes on to allege that his reliance on Defendant's representations resulted in his wrongful termination. This does not follow. If, rather than relying on Plaintiff's alleged representations and pursuing the appeals process, Plaintiff had filed a lawsuit, this would not have prevented Plaintiff from being terminated. Indeed, Plaintiff seems to simply be alleging that had he known Defendant's representations were untrue, he would have filed the instant lawsuit sooner.

Because Plaintiff has failed to allege the type of reliance and resulting damages contemplated by California case law concerning deceit, including *Lazar*, Plaintiff has not presented sufficient evidence to allow a reasonable trier of fact to find that Defendant's representations concerning its appeals process and its treatment of disabled individuals amounted to deceit. As such, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's cause of action for deceit.

*I. Violation of California Business and Professions Code § 17200*

On November 17, 2003, Plaintiff filed his First Amended Complaint (the "FAC"). The FAC added a cause of action for viola-

tion of California Business and Professions Code § 17200. Because the FAC was filed after Defendant brought its Motion for Summary Judgment, Defendant did not address the § 17200 claim in its Motion. As such, the Court does not address the § 17200 claim herein, and the claim remains in the case.

### K. Remaining Issues of Fact

In light of the Court's Order GRANTING IN PART AND DENYING IN PART Defendant's Motion for Summary Judgment, several issues remain for the trier of fact in the case. With regard to Plaintiff's claim for failure to provide a reasonable accommodation for a disability in violation of Cal. Gov't Code § 12940(m), the following issues of fact remain:

1. Did Plaintiff's condition constitute a "disability" for purposes of the FEHA? In making this determination, the trier of fact will need to determine whether Plaintiff's condition limited a major life activity, including working.

2. If Plaintiff was disabled, was Defendant aware of Plaintiff's disability? This determination will require the trier of fact to decide whether Dr. Bloch's report contained medical information about Plaintiff's psychological condition that would have been necessary for Defendant to modify Plaintiff's work duties, and whether, in the exercise of ordinary care, Schempp and Skelton should have communicated such information to Defendant even though Plaintiff's workers' compensation claim was not found compensable.

3. Would a reassignment away from Plaintiff's then-current supervisors have ameliorated Plaintiff's attendance problem, such that Plaintiff could have performed the essential duties of his job?

4. Could Defendant reasonably have accommodated Plaintiff by reassigning him to another supervisor?

With regard to Plaintiff's claim for disability discrimination in violation of Cal. Gov't Code § 12940(a), the following issues of fact remain:

1. Did Plaintiff's condition constitute a "disability" for purposes of the FEHA?

2. Would a reassignment away from Plaintiff's then-current supervisors have ameliorated Plaintiff's attendance problem, such that Plaintiff was "qualified" as required by *McDonnell Douglas?*

Plaintiff's claim for wrongful termination in violation of public policy stands or falls on the basis of his cause of action for disability discrimination, so Plaintiff's claim for wrongful termination in violation of public policy depends upon the same issues of fact as Plaintiff's cause of action for disability discrimination.

Similarly, because Defendant's employee manual states that Defendant reasonably accommodates disabled employees, Plaintiff's cause of action for breach of contract depends upon the same issues of fact as Plaintiff's cause of action for failure to provide a reasonable accommodation for a disability.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment [29] is GRANTED with respect to Plaintiff's causes of action for breach of the implied covenant of good faith and fair dealing and deceit. However, because material issues remain for the trier of fact on each of Plaintiff's other causes of action, Defendant Federal Express Corporation's Motion for Summary Judgment or Summary Adjudication [29] is DENIED with respect to Plaintiff's causes of action for

wrongful termination in violation of public policy, disability discrimination in violation of Cal. Gov't Code § 12940(a), failure to provide a reasonable accommodation for a disability in violation of Cal. Gov't Code § 12940(m), and breach of contract. In addition, Plaintiff's cause of action for violation of Cal. Bus. & Prof.Code § 17200 remains in the case as it was not at issue in the instant Motion.

IT IS SO ORDERED.